Craig T. McFARLAND, Trustee for Capital Growth Trust, on behalf of himself and all others similarly situated, Plaintiff,

v.

**MEMOREX CORPORATION et al., Defendants.**

Craig T. McFARLAND, Trustee for Capital Growth Trust, on behalf of himself and all others similarly situated, Plaintiff,

v.

**LEHMAN BROTHERS KUHN LOEB, INC., et al., Defendants.**

No. C–79–2007–WAI, C–79–2926–WAI.

United States District Court, N. D. California.

Feb. 12, 1980.

David B. Gold argued, Paul F. Bennett, George Donaldson, David L. Braverman, San Francisco, Cal., for plaintiff.

Lawrence Calof, J. Michael Brennan argued, Samuel O. Pruitt, Jr., Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant Memorex Corp. et al.

Graham B. Moody argued, Boake Christensen, Philip R. Rotner, Stephen C. Garavito, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant Deloitte, Haskins & Sells.

W. Reece Bader, Richard E. Levine, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for defendants BankAmerica Foundation, California First Bank, and Bank of California, N. A.

E. Judge Elderkin, Vincent Paul Finigan, Donald W. Brown, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant Wells Fargo Bank, N. A.

Edmund T. King, II, Lawrence A. Hobel, Severson, Werson, Berke & Melchior, San Francisco, Cal., for defendant Crocker Nat. Bank.

Charles A. Legge, Robert J. Stumpf, Bronson, Bronson & McKinnon, San Francisco, Cal., for defendants Aetna Cas. and Sur. Co. and General Elec. Credit Corp.

James J. Hagen argued, Simpson, Thacher & Bartlett, New York City, Douglas M. Schwab, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants Lehman Brothers Kuhn Loeb, Inc., and Blyth Eastman Dillon & Co., Inc.

## MEMORANDUM OF DECISION

INGRAM, District Judge.

In two actions brought on behalf of a class and consolidated by order of this Court, plaintiff has charged defendants with violating virtually every section of the Securities Act of 1933 and the Securities Exchange Act of 1934 that can be violated and with committing additional common law and state statutory offenses. Defendants have moved to dismiss on numerous grounds. The questions have been briefed and argued, and this Court now concludes that the motions must be granted for the reasons discussed herein.

Plaintiff alleges causes of action under sections 11, 12, 15 and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, 77*o* & 77q (1976), sections 10(b), 18(a) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78r(a) & 78t (1976), and Rule 10b–5 of the Rules and Regulations adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b–5 (1979). In his pendent claims, plaintiff alleges fraud, deceit, negligent misrepresentation, negligence, professional malpractice and breach of fiduciary duty.[1] First Amended Complaint ¶¶ 1, 13 (filed Aug. 8, 1979) (hereinafter referred to as "complaint").[2]

The suits arise out of the offer and sale of 1,269,536 shares of common stock of Memorex Corporation under both a registration statement, filed with the Securities and Exchange Commission on July 24, 1978, and a prospectus, dated and effective August 9, 1978.[3]

There are 42 named defendants in C–79–2007–WAI, and 103 named defendants in C–79–2926–WAI. The defendants can be divided into five categories:

(1) Memorex Corporation, the issuer of the common stock;

(2) the Underwriters;[4]

---

1. Plaintiff includes "declaratory relief" among his pendent claims, but this is not mentioned elsewhere in the complaint, including the prayer for relief. Complaint ¶ 1, I.

2. This opinion will treat the complaints in C–79–2007–WAI and C–79–2926–WAI as one; the complaints are identical except with respect to the named defendants.

3. The proposed plaintiff class consists of all persons who purchased Memorex stock between August 9, 1978, and October 31, 1978.

Complaint ¶ 7–2. The significance of the October 31 closing date is not set out in the complaint.

4. Only Lehman Brothers Kuhn Loeb, Inc., and Blyth Eastman Dillon & Co., Inc., the lead underwriters, are named in C–79–2007–WAI. These two underwriters are named as well in C–79–2926–WAI, which names as defendants all 103 underwriters identified in the amended registration statement at pages 25, 26 and 27.

(3) 24 individuals who were officers or directors of Memorex Corporation, or both, at the time of the stock offering;

(4) Deloitte, Haskins & Sells, independent certified public accountants, identified in the prospectus at page 6 as having examined and certified Memorex's Consolidated Statements of Operations for each of the four years ending December 31, 1977; and

(5) 14 individuals and entities who sold warrants to purchase 519,536 shares of common stock of Memorex to the underwriters prior to the August 9, 1978, offering.

Plaintiff paints his allegations with a broad brush. No effort is made to set forth each defendant's precise wrongdoing and potential liability. Plaintiff alleges that "each defendant committed the statutory and common law violations alleged in this complaint, directly or indirectly," Complaint ¶ 3, and further, that "each defendant is sued both individually and as a co-conspirator and as an aider and abettor," id. ¶ 4. In addition, he alleges that "all the allegations made in this complaint are made upon information and belief." Id. ¶ 5(b). Finally, to cement the links between the defendants, plaintiff alleges that "the above listed defendant officers and directors of Memorex and the Selling Warrant Holders were individually and collectively at all times herein mentioned controlling persons of Memorex. Each of the defendants herein referred to, including Memorex, acted as agent for each." Id. ¶ 6(g).[5]

This complaint sounds entirely in fraud. Complaint ¶¶ A, 1, 8, 9, 10, 11, 13. As will be discussed below in greater detail, plaintiff has assumed a greater burden with respect to both pleading and proof than had he merely alleged a violation, for example, of section 11 of the 1933 Act.[6]

A careful reading of the complaint reveals that the alleged misdeeds are all detailed in paragraph 10, which reads:

All or part of said statements and omissions were contained in, among other documents, the Prospectus and Registration Statement signed and filed by the defendants with the Securities and Exchange Commission effective August 9, 1978, and prepared with the participation, acquiescence, encouragement or assistance of the defendants, and each of them. (a) The defendants misrepresented the financial condition, net earnings, assets and net worth of Memorex by means of, inter alia :

(1) Failing to disclose and thereby misrepresenting manufacturing cost variances;

(2) Failing to disclose and thereby misrepresenting costs associated with the manufacture of new products;

(3) Failing to properly account for and thereby misrepresenting cost increases involved in the company's decentralization of facilities;

(4) Failing to properly account for and thereby misrepresenting the effective tax rate applicable to the earnings of the company; and

(5) Failing to disclose and thereby misrepresenting the company's sales revenues;

(b) In addition to the foregoing, the defendants attempted to conceal the company's materially poor and disappointing operating results for the third quarter ended September 29, 1978, by failing to properly account in prior periods for known increased expenses and costs.

(c) The defendants misrepresented that the audited financial statements used in

---

**5.** There is an apparent incongruity between paragraphs 3 and 6(g) of the complaint. While paragraph 3 alleges that *each* defendant is liable for every statutory and common law violation, paragraph 6(g) attempts to limit "controlling person" liability (presumably within the context of section 15 of the 1933 Act and section 20 of the 1934 Act) to the officers and directors of Memorex and to the selling warrantholders. Because the "control" allegations

are inadequate with respect to *any* defendant, this discrepancy need not be resolved at this time.

**6.** *See, e. g., Ross v. Warner*, 480 F.Supp. 268, 273 (S.D.N.Y. 1979) ("At the outset, it should be noted that a successful action under Section 11 does not require proof of fraud, [citation omitted], and, therefore, the Rule 9(b) particularity requirement does not apply.").

the Registration Statement and the Prospectus fairly presented the financial condition and operating results of Memorex. No other allegations of impropriety are specified in the complaint.

Defendants have moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failing to state a claim upon which relief can be granted, and under Fed.R.Civ.P. 9(b) for failing to state the circumstances constituting fraud with particularity.

*RULE 9(b)*

Because this complaint sounds entirely in fraud, it is held to a higher standard of pleading specificity than that of Fed.R. Civ.P. 8. Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The defendants argue persuasively that the charging allegations of the complaint, as set forth in paragraph 10, do not meet the Rule 9(b) standards.

The commentators have discussed at length the policy reasons underlying the rigorous standards of Rule 9(b). "Allegations of fraud or mistake frequently are advanced only for their nuisance or settlement value and with little hope that they will be successful." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1296 at 399–400 (1969). *See also* 2A J. Moore, *Federal Practice* ¶ 9.03 (2d rev. ed. 1979). In *Temple v. Haft*, 73 F.R.D. 49, 52 (D.Del. 1976), the court noted, "A primary purpose [of Rule 9(b)] is to prevent injury to the reputations of potential defendants from irresponsible, improvident, and cavalier allegations of fraud . . . Particularity in

the complaint is also required to minimize the number of unfounded 'strike suits'." *See also Lewis v. Black*, 74 F.R.D. 1 (E.D.N.Y.1975); cases cited in *Temple v. Haft, supra*, 73 F.R.D. at 52.

The defendants argue that, while they have been charged with serious misdeeds, they are unable to determine what these are. A reading of paragraph 10 leaves this Court only with additional questions: what manufacturing cost variances? what costs associated with the manufacture of new products? what costs associated with decentralization? what discrepancies in the effective tax applicable to the company's earnings?[7] how were sales revenues misrepresented? which costs should have been accounted for in prior periods? in what manner do the audited financial statements misrepresent the financial condition of Memorex?

Plaintiff responds that the defendants have fair notice of the charges directed against them. He concedes that much of the "detail" of his complaint comes from an article that appeared in the *Wall Street Journal* on October 18, 1978.[8] That article quoted Memorex officials regarding earnings pressures.

 Plaintiff argues essentially that, since Memorex itself announced that it experienced costs respecting decentralization and new products, and the like, it cannot claim in good faith that the complaint lacks detail. Indeed, plaintiff suggested in argument that he can provide detail only after discovery has begun.[9] This "detail following discovery" rationale has been firmly rejected by the courts:

A complaint alleging fraud should be filed only after a wrong is reasonably

---

7. At oral argument on January 2, 1980, counsel for Memorex commented that, in the press release from which the plaintiff admittedly drew his charges, Memorex announced that taxes were *lower* than anticipated. It is unclear how a reduction in taxes resulted in any harm to plaintiff.

8. *See* Memorandum in Opposition to Certain Defendants' Motions to Dismiss (filed Nov. 19, 1979) (unnumbered exhibit).

9. *See* Reporter's Transcript at 18–19 (Dec. 7, 1979). Instead, counsel for plaintiff has submitted a document entitled "Declaration of Joseph Zimmerman, CPA," filed November 19, 1979. That document speculates about Memorex's "probable" accounting procedure. The Court strikes it from the record because it is not based on the declarant's personal knowledge and is thus irrelevant.

believed to have occurred; it should serve to seek redress for a wrong, not to find one.

Segal v. Gordon, 467 F.2d 602, 607–08 (2d Cir. 1972).

Complaints should not be conceived merely as tokens, guaranteeing access to a world of discovery . . . Neither plaintiff nor his counsel are entitled to roam through a defendant's files at the mere drop of a "complaint."

Denny v. Barber, 73 F.R.D. 6, 10 (S.D.N.Y. 1977) (citations omitted), aff'd, 576 F.2d 465 (2d Cir. 1978).

■ Plaintiff contends that he has met the Rule 9(b) requirements by merely identifying the "time, place, and nature" of the alleged fraud. He relies principally on Walling v. Beverly Enterprises, 476 F.2d 393 (9th Cir. 1973); Oscar Gruss & Son v. Geon Indus., Inc., 75 F.R.D. 531 (S.D.N.Y. 1977); and In re Equity Funding Corp. of America Securities Litigation, 416 F.Supp. 161 (C.D.Cal.1976). None of these cases lend support to plaintiff's position. In Gruss, the complaint described what the misstatement was (inclusion of intercompany profit derived from the transfer of inventory among intracorporate groups) and identified its amount and its effect. While the defendants had argued that the complaint did not adequately identify the accounting principle violated, the court deemed it sufficient because "the exact nature of the accounting failure is set out as it is in the complaint." 75 F.R.D. at 531. Similarly, in In re Equity Funding, the court began its discussion by outlining briefly the allegations of the complaint:

In paragraphs 10–48, the Complaint sets out the alleged fraudulent activities related to EFCA and the acts of each defendant for which liability is claimed.

416 F.Supp. at 171 (emphasis added).

It is apparent from the court's discussion that the complaint set out in significant detail the nature and effect of the fraudulent devices used by each defendant. Finally, plaintiff suggests that Walling sets forth the standards adopted by the Ninth Circuit for reviewing Rule 9(b) questions. Walling cannot be so characterized. In Walling, the court upheld a complaint that alleged that the defendants had a secret agreement not to perform a contract entered into with the plaintiffs. The court held:

Therefore, while mere conclusory allegations to the effect that defendant's conduct was fraudulent in violation of Rule 10b–5 are insufficient, [citation omitted], here West Texas Shareholders have done much more. They have stated the time, place and nature of the alleged fraudulent activities. The fraud was entering into the August 26, 1969 agreement with only a limited intention of performing. This is a sufficient averment. [citation omitted] The circumstances constituting the alleged fraud have been pled with sufficient definiteness to advise Beverly of the claim it must meet.

476 F.2d at 397.

The court did not set forth standards for review of Rule 9(b) sufficiency. The court merely stated that the particular complaint before it detailed its allegations properly. Indeed, none of the cases relied upon by the plaintiff sets forth the standards that he urges us to adopt. In each case, the court simply concluded that the complaint being considered had been pleaded with adequate particularity. A review of the cases shows that each complaint was significantly more detailed than the complaint filed here.

This Court concludes that the allegations are little more than conclusory in nature, and appear to be based on no facts apart from the general comments that appeared in a Memorex press release dated October 18, 1978, and in the Wall Street Journal article noted above. Plaintiff cannot simply say that the defendants know what they did wrong, and that pointing to the transgressing documents (the registration statement and prospectus) gives the defendants adequate notice of the charges against them. See Segal v. Gordon, 467 F.2d 602, 607 (2d Cir. 1972) (and cases cited therein).

Memorex, its officers, and its directors are entitled to a precise statement of what they failed to disclose. Similarly, the underwriters are entitled to a description of

their allegedly fraudulent activities. So too are the selling warrantholders, who apparently did little more than sell their warrants to the underwriters. Finally, the accountants are owed an explanation of their alleged improprieties.[10]

With respect to the accountants, this Court concurs in the reasoning of *Rich v. Touche Ross & Co.*, 68 F.R.D. 243 (S.D.N.Y. 1973). The plaintiffs there alleged "that the defendant accounting firm violated §§ 10(b) and 18 of the Securities Exchange Act of 1934 and Rule 10b–5 in that they 'unlawfully, willfully and recklessly made untrue statements' or omitted to state material facts in reports and financial statements of Weis, disregarding generally accepted accounting principles and procedures." *Id.* at 245. The court succinctly stated:

> The requirement that allegations of fraud be pleaded with particularity stems from, among other sources, a concern that potential defendants be shielded from lightly made public claims or accusations charging the commission of acts or neglect of duty which may be said to involve moral turpitude. [citation omitted] *The need for this protection is most acute where the potential defendants are professionals whose reputations in their field of expertise are most sensitive to slander.* [citation omitted].

*Id.* at 245 (emphasis added).

The court reproduced the sections of the complaint that detailed the charges against the accountants, and concluded:

> This list of offenses fails to state "the circumstances constituting fraud" . . . The plaintiffs do not identify the financial statements and reports which they claim mislead them, apart from a passing reference to the financial report for the year ending May 26, 1972. Simply denominating unspecified financial statements and reports as "false," "misleading" or "inaccurate" is not sufficient. *There must be further identification of*

> *what statements were made and in what respects they were false, misleading or inaccurate or what omissions were made and why the statements made are believed to be misleading.*

*Id.* at 246 (emphasis added).

Paragraph 10(c) of this complaint broadly alleges that "the defendants misrepresented that the audited financial statements used in the Registration Statement and the Prospectus fairly presented the financial condition and operating results of Memorex." It appears from the registration statement that Deloitte, Haskins & Sells prepared the financial statements for the four years ending December 31, 1977. The registration statement and prospectus include much financial data. Here, as in *Rich*, the accountants are entitled to know specifically how their audited statements are misleading or how they otherwise fail to meet accounting standards. *See Felton v. Walston & Co.*, 508 F.2d 577 (2d Cir. 1974); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518 (S.D.N.Y.1977). Without the "particularized information in order to understand what conduct is complained of," *Rich v. Touche Ross & Co., supra*, 68 F.R.D. at 245, the accountants will be unable to defend against these charges of misconduct. Plaintiff surely cannot be contending that the statements prepared by Deloitte, Haskins & Sells are misleading for the entire four year period.

■ All of the plaintiff's allegations are made on "information and belief." Professor Moore has noted, "As a general rule, general allegations based on information and belief do not satisfy [Rule 9(b)]." 2A J. Moore, *Federal Practice* ¶ 9.03, at 9–26 (2d rev. ed. 1979). In this regard the Second Circuit has held:

> The first complaint was obviously filed on the basis of little investigation or research . . . The allegations violate the general rule that Rule 9(b) pleadings cannot be based "on information and belief." While the rule is relaxed as to

---

**10.** The Court cannot agree with plaintiff's counsel that generalized accusations suffice.

*See* Reporter's Transcript at 16 (Dec. 7, 1979).

matters peculiarly within the adverse parties' knowledge, the allegations must then be accompanied by a statement of the facts upon which the belief is founded.

*Segal v. Gordon, supra,* 467 F.2d at 608. Even though this standard permits information-and-belief pleading, it requires that a plaintiff allege sufficient detail to demonstrate that his complaint is grounded in *some* facts. *See Goldberg v. Meridor,* 81 F.R.D. 105, 111 (S.D.N.Y. 1979); *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 419–20 (S.D.N.Y. 1978).[11]

Plaintiff cannot claim that the subject matter of his complaint is "peculiarly within the adverse parties' knowledge." Moore, *supra,* ¶ 9.03, at 9–26. He must know which cost increases were hidden, how the reported tax rate was deceptive, and how the earnings reports were misleading. Specific details might be missing, but if plaintiff cannot allege even the barest details, he cannot rely on discovery to make his case. Merely pleading on "information and belief" does not relieve him of the burdens imposed by Rule 9(b). Plaintiff remains obligated to state with clarity the particular misrepresentations forming the heart of his complaint. In the words of one court:

> [I]t is no answer to say, as plaintiff's counsel herein has stated, that at the time the complaint was drawn the essential facts were in the exclusive possession of the defendants and magnanimously offer to replead in light of information subsequently acquired. Obviously, that approach does violence to the salient purpose of the Rule, which is designed to discourage this 'sue first, ask questions later" philosophy.

*Berman v. Richford Indus., Inc.,* Fed.Sec.L. Rep. (CCH) ¶ 96,448, at 94,016 (S.D.N.Y. 1978).

This Court concludes that the complaint is flawed by its lack of specificity. The allegations of Paragraph 10 are vague and indefinite: no defendant is told how his actions form the basis of potential liability. As one court has succinctly stated:

> The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the "defendants," for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.

*Jacobson v. Peat, Marwick, Mitchell & Co., supra,* 445 F.Supp. at 522 n.7 (S.D.N.Y. 1977).

█ When he amends his complaint, plaintiff will be required to detail the misrepresentations made, the manner in which they are false, and the facts that support an inference of fraud by each defendant. Until that hurdle is passed, plaintiff is not free to conduct discovery. Discovery allows parties to develop the facts underlying their claims and defenses; it is not a vehicle for uncovering the claims themselves. This Court concurs fully in Justice Rehnquist's reasoning in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975) (emphasis added):

> The potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure may likewise exist in this type of case to a greater extent than they do in other litigation. The prospect of extensive deposition of the defendant's officers and associates and the concomitant opportunity for extensive discovery of business documents, is a common occurrence in this and similar types of litigation. To the extent that this process eventually produces relevant evidence which is useful in determining the merits of the claims asserted by the parties, it bears the imprimatur of those Rules and of the many cases liberally interpreting them. *But to the extent that it permits a plaintiff with a largely groundless claim to simply take up the*

---

11. Plaintiff relies on *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974), to support his contention that he has sufficiently pleaded the facts on which his belief rests. A review of that opinion, *id.* at 378–79, shows that the complaint included significantly more detail than plaintiff has here provided.

*time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.*

The complaint must be dismissed in its entirety for failing to meet the requirements of Rule 9(b).

## SECURITIES ACT OF 1933 AND SECURITIES EXCHANGE ACT OF 1934

The fact that the complaint fails to pass muster under Rule 9(b) does not conclude the Court's inquiry. In meeting the specificity requirements of Rule 9(b), plaintiff must identify the charging allegations directed at each defendant. For that reason, the Court will analyze the sections of the securities acts that plaintiff alleges have been violated. From this review it will appear that more detail cannot cure the flaws in the complaint with respect to many defendants. Indeed, no cause of action can be stated against certain defendants because the securities acts limit both liability and the relief available.

The parties have widely diverging views of the federal securities laws. Defendants advocate a "strict constructionist" position. They rely largely on the statutory language, and turn to legislative history to elicit Congress' intent when it adopted a particular provision. In contrast, plaintiff asks this Court to adopt what might fairly be called an impressionistic interpretation. Plaintiff suggests that Congress did not mean to foreclose any remedy to any party when it adopted the securities acts. For example, section 17(a) of the 1933 Act should be viewed as a "catchall" provision because, to paraphrase plaintiff's counsel, Congress could not have foreseen all wrongdoers and covered them in the sections that provide express remedies. Similarly, plaintiff argues that it is inappropriate to place "labels" on the defendants because the evidence will later show who is a control per-

son and because Congress did not intend to limit liability to the categories of persons included in sections 11 and 12 of the 1933 Act.[12] Thus, as plaintiff would have it, Memorex's president "participated" in the stock offering within the meaning of section 11 because he voiced optimistic earnings projections to securities analysts. In sum, plaintiff urges this Court to emphasize the remedial character of the statutes, and to read the language freely and loosely.[13]

This Court will not adopt the position advocated by plaintiff. That this view contradicts the most recent statements from the Supreme Court. Last term, in a 7–1 opinion, the Court stated:

> The invocation of the "remedial purposes" of the 1934 Act is similarly unavailing. Only last Term, we emphasized that generalized references to the "remedial purposes" of the 1934 Act will not justify reading a provision "more broadly than its language and the statutory scheme reasonably permit." *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 116, [98 S.Ct. 1702, 1711, 56 L.Ed.2d 148] (1978); *see Ernst & Ernst v. Hochfelder,* 425 U.S. [185] at 200, [96 S.Ct. 1375, at 1384, 47 L.Ed.2d 668]. . . . *The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law.*

*Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (emphasis added).

*See also Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 24, 97 S.Ct. 926, 940, 51 L.Ed.2d 124 (1977). With respect to each statutory violation alleged in the complaint, the Court must look to the statute itself. If the statute does not provide a remedy, this Court will not imply one unless it is clear that one was intended. The Supreme Court has made clear that the securities acts are *not* to be interpreted as a federal common law of securities, and that traditional rules of strict construction apply. *See Transameri-*

---

**12.** *See* Reporter's Transcript at 14 (Dec. 7, 1979).

**13.** *See id.* at 31–2.

ca *Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co., supra; Securities & Exch. Comm'n. v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

## SECTION 11

Section 11(a) of the Securities Act of 1933, 15 U.S.C. § 77k(a) (1976), provides in part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—
>
> (1) every person who signed the registration statement;
>
> (2) every person who was a director of (or person performing similar functions) or a partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
>
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
>
> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his con-sent been named as having prepared or certified any part of the registration statement, or having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
>
> (5) every underwriter with respect to such security.

A threshold issue is whether plaintiff has standing to sue under section 11. Plaintiff has not alleged that he purchased any shares pursuant to the registration statement and prospectus. He has alleged only that he purchased 300 shares of Memorex stock on September 6, 1978, and an additional 500 shares on September 8, 1978. This fact alone does not compel the inference that his shares were among the newly issued securities.[14]

The courts have consistently held that section 11 remedies cover only shares newly issued under the registration statement. In *Barnes v. Osofsky,* 373 F.2d 269 (2d Cir. 1967), Judge Friendly cogently analyzed the legislative history, and concluded:

> Without depreciating the force of appellants' criticisms that this construction gives § 11 a rather accidental impact as between one open-market purchaser of a stock already being traded and another, *we are unpersuaded that, by departing from the more natural meaning of the words, a court could come up with anything better.* What appellants' argument does suggest is that the time may have come for Congress to reexamine these two remarkable pioneering statutes in the light of thirty years' experience, with a view to simplifying and coordinating their different and often overlapping remedies.

14. Plaintiff's deposition testimony indicates that he tried unsuccessfully two times to purchase in the August 9 offering before he bought stock on the open market. McFarland Deposition Transcript at 41, 49.

The "Declaration of David L. Braverman," filed November 19, 1979, appears to be an effort to show that plaintiff purchased new shares. But this declaration contains only unverified speculation as to the meaning of certain notations on unauthenticated copies of plaintiff's purchase confirmation slips, and as such, has no bearing on these motions.

*Id.* at 273 (emphasis added).

*See also Lorber v. Beebe,* 407 F.Supp. 279, 286 (S.D.N.Y.1975) ("[A] plaintiff, in order to have a valid § 11 cause of action, must plead and prove that his stock was issued pursuant to the particular registration statement alleged to be defective."); *Unicorn Field, Inc. v. Cannon Group, Inc.,* 60 F.R.D. 217, 226 (S.D.N.Y.1973). This Court concurs fully with Judge Friendly's conclusions. If plaintiff is to state a cause of action under section 11, he must allege that he purchased new stock. Alleging or proving that the stock, purchased in the open market, might have been issued pursuant to the registration statement does not meet this requirement. *See Lorber v. Beebe, supra,* 407 F.Supp. at 287 ("[I]t is insufficient that stock 'might' have been issued pursuant to a defective statement."). For this reason alone, the section 11 claim must be dismissed. Even apart from this, plaintiff can only state a cause of action under section 11 against certain defendants.

*1. Officers and Directors.*

■ It is undisputed that Memorex's directors bear potential section 11 liability whether or not they signed the registration statement. But the same does not hold true of officers. Section 6(a) of the 1933 Act, 15 U.S.C. § 77f, requires that an issuer's principal executive officer, its principal financial officer, and its principal accounting officer sign a registration statement. Memorex contends that only two of its officers who were not also directors signed the registration statement. Memorandum of Points and Authorities in Support of Motion to Dismiss at 6 (filed Oct. 1, 1978). Direct liability under section 11 is limited to these two officers and to the directors. The nonsigning officers cannot be held liable under section 11. *See In re Gap Stores Securities Litigation,* 457 F.Supp. 1135, 1143 (N.D.Cal.1978) (section 11 liability "is limited to persons who are signators of the registration statement, directors or partners of the issuer, experts named as preparing or certifying a portion of the registration statement, or underwriters with respect to the issue").

■ Plaintiff asserts that he can state a section 11 claim against the nonsigning officers under a section 15 "controlling person" theory. As will be discussed below, plaintiff has not adequately alleged any Section 15 claim. But even if he had, Section 15 does not make control persons directly liable under section 11.

Relying on *In re Caesars Palace Securities Litigation,* 360 F.Supp. 366, 384 (S.D.N.Y. 1973), plaintiff also suggests that the nonsigning officers can be held liable under section 11 for aiding and abetting other wrongdoers. In that case, the court did permit co-conspirator and aider and abettor liability under section 11. This Court declines, however, to follow what it regards as a minority position. Judge Lucas' reasoning in *In re Equity Funding Corp. of America Securities Litigation,* 416 F.Supp. 161 (C.D. Cal. 1976), is more persuasive:

There are other limitations on the plaintiffs' aider and abettor claims. Most of the statutes on which plaintiffs base these claims specifically limit the categories of persons that can be held liable under those statutes . . . This court is of the opinion that *where a statute specifically limits those who may be held liable for the conduct described by the statute, the courts cannot extend liability, under a theory of aiding and abetting, to those who do not fall within the categories of potential defendants described by the statute. To impose such liability would circumvent the express intent of Congress in enacting these statutes that proscribe narrowly defined conduct and allow relief from precisely defined parties.*

*Id.* at 181 (emphasis added).

To sanction a theory of aiding and abetting would be to essentially gut the statutory definitions of meaning. Such a theory is not novel. If Congress had intended that this theory apply to section 11, it would have so stated either in the statute or in the legislative history. Because it did not do so, this Court will not move beyond the clear and apparent meaning of the statutory formulation.

## 2. Accountants.

■ The accountants cannot be held liable under section 11 as the complaint is drafted. The language of that section plainly states that an accountant may be sued *only* with respect to that part of a registration statement "which purports to have been prepared or certified by him." 15 U.S.C. § 77k(a)(4) (1976). Thus, even if part of a registration statement is misleading, there is no accountant liability unless the misleading data can be expressly attributed to the accountant. *See, e. g., Grimm v. Whitney-Fildago Seafoods, Inc.,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,029, at 91,608–09 (S.D.N.Y. 1973).

■ As discussed above, the accountants are named in the registration statement as having prepared or certified only the consolidated financial statements for the years 1974 through 1977. The complaint when liberally construed, challenges the 1978 financial information. The registration statement prominently labels all financial statements or summaries of operations for 1978 as "unaudited." [15] Because of this, the accountants can bear no section 11 liability for any misstatement of the 1978 financial data.

Plaintiff contends that he has alleged that the audited statements are misleading as well. As discussed above, this bare allegation cannot state a claim under section 11. More significant, however, is the argument that

The accountants' potential liability under § 11 also arises from the fact that they were involved in the preparation and review of the unaudited financial statements of the company for the six months ended June 30, 1978. In this regard, they provided "cold comfort" letters and other reports and valuations to the underwriters (and most likely to other defendants herein) which were used "in connection with the registration statement."

Plaintiff's Memorandum at 31–32.

This argument is flawed because section 11(a)(4) *limits* liability. Because the accountants are not "named as" having prepared the allegedly misleading portions of the registration statement, their participation in the preparation of the misleading figures is irrelevant to section 11.

Plaintiff's speculation regarding any "cold comfort" letter is equally unavailing. Such speculation need not of course be considered, but even if plaintiff had properly raised the point, he has no standing to base a section 11 claim on a letter to the underwriters. *See, e. g., Escott v. BarChris Constr. Corp.,* 283 F.Supp. 643, 698 (S.D.N.Y. 1968) ("Plaintiffs may not take advantage of any undertakings or misrepresentations in this letter. . . . · [T]hat is a matter which relates only to the crossclaims which defendants have asserted against each other."); *Grimm v. Whitney-Fildago Seafoods, Inc., supra* at 91,609.

Contrary to the assertion that "Deloitte, Haskins & Sells' participation in the preparation of these statements is a question of fact," (Plaintiff's Memorandum at 33), this Court concludes as a matter of law that "an independent accountant's liability under section 11 is limited to those figures which he certifies." *Id.* at 91,608. The *only* question is whether the accountants are "*named* as having prepared or certified any part of the registration statement." 15 U.S.C. § 77k(a)(4) (emphasis added). The accountants' potential section 11 liability is limited to properly identified misleading statements in the certified financial data included in the registration statement.[16]

15. *See* Amended Registration Statement at 6 ("The Consolidated Statements of Operations for the three months ended March 31, 1978, and 1977 have not been examined by independent certified public accountants").

16. On December 28, 1979, the Securities and Exchange Commission adopted a rule providing that a report prepared or certified by an accountant within the meaning of section 11 of the 1933 Act shall *not* include a report by an independent accountant on a review of unaudited interim financial information, thereby excluding accountants issuing such reports from section 11(a) liability. The SEC noted that its new rule was consistent with existing case law. "Under existing case law, Section 11(a) liability of an accountant who has consented to being

### 3. Selling Warrantholders.

■ A close reading of the complaint reveals no theory under which the selling warrantholders can be held liable under Section 11. The warrantholders do not at first blush appear to fall within the classes of persons that are subject to Section 11 liability: they did not sign the registration statement or contribute professional services to its preparation; they did not serve as directors of the issuer; and, they did not formally underwrite the stock issuance. Arguing that form should not prevail over substance, plaintiff suggests that the warrantholders are liable because they should be regarded as underwriters within the meaning of section 2(11) of the Securities Act of 1933, 15 U.S.C. § 77b(11) (1976), which provides in part:

> The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

It appears from the complaint that the warrantholders held warrants that gave them the right to purchase just over half a million shares of Memorex common stock. The warrantholders sold these warrants to the underwriters for value. The underwriters then exercised the warrants, bought the shares of Memorex common stock, and distributed those share to persons who bought in the offering. Plaintiff argues that the warrantholders "participated" in the underwriting, and hence became underwriters within the meaning of section 2(11), because they received substantial proceeds from their sale of the warrants to the underwriters.

It is crucial to the definition of "underwriter" that any underwriter must participate in the distribution of a security. There is no allegation here, however, that the warrantholders purchased any Memorex securities with a view to distribution or that they offered or sold any security on behalf of Memorex.

In *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), the Supreme Court held that "[l]iability cannot be imposed simply because the investor has structured his transaction with the intent of avoiding liability." 404 U.S. at 422, 92 S.Ct. at 599. In that case, a corporation owned 13.2% of the stock of another corporation and was thus subject to section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), which regulates short-term trades. The purchasing corporation liquidated all of its holdings within six months of purchase, but did so in two transactions. The first sale reduced its interest to 9.96%, which freed it from § 16(b) exposure for the sale of the remaining interest. The Court held that there was no liability on the second sale even though the first sale was expressly completed to immunize the disposal of the remaining shares. The Court gave a literal reading to the unambiguous statutory language and refused to examine the seller's intent.

> If a "two-step" sale of a 10% owner's holdings within six months of purchase is thought to give rise to the kind of evil that Congress sought to correct through § 16(b), *those transactions can be more effectively deterred by an amendment to the statute that preserves its mechanical quality than by a judicial search for the will-o'-the-wisp of an investor's "intent" in each litigated case.*

named in a registration statement has been limited to audited financial statements which have been certified by him. [citing *Escott* and *Grimm*]." Securities and Exchange Commission, Release No. 33–6173, at 8. In explaining the rule, the SEC commented, "[A]n impetus for proposing the rules was concern that, if SAS No. 24 reports are used by registrants in connection with Securities Act registration statements, there may be reluctance on the part of accountants to issue reports on the basis of the limited review procedures specified in SAS No. 24 because of their potential liability under Section 11(a) of the Securities Act; and that, alternatively, if accountants perform significantly expanded procedures, much closer to a complete audit, in order to meet potential liability concerns under Section 11(a), substantial increased costs to issuers could result." *Id,* at 9.

404 U.S. at 425, 92 S.Ct. at 600 (emphasis added).

Similarly, this Court will not strain the definition of a statutory term in order to classify the warrantholders as underwriters. The warrantholders structured the transaction in an unquestionably legitimate fashion, and they cannot be subjected to liability just because they sought to avoid the risks of an underwriter.

The Memorex stock was sold by professional underwriters as a firm commitment underwriting. The underwriters are identified in the registration statement and prospectus. The mere delivery of the warrants to the underwriters did not convert the warrantholders to underwriters. Indeed, the warrantholders *never* owned the underlying shares of common stock; they sold their unexercised warrants to the underwriters. If the underwriters had been unable to sell the stock to the public, they would have had no recourse against the selling warrantholders. The Court must consider whether the warrantholders "participated" in the underwriting from this risk-bearing perspective.

In a firm commitment underwriting, an underwriting syndicate agrees to purchase and pay for all shares. Because it bears the risk of being unable to sell those shares to the investing public, the underwriting syndicate exacts a *greater price than is customary* for its services. In this underwriting, the underwriters received a commission of $2 on each share of stock sold. *See* Prospectus, at II–1. Because the warrantholders took no similar risk and received no corresponding reward, it would be anomalous to include them within the definition of underwriter along with those who engaged in the selling effort.

The defendants have provided the Court with an exhaustive review and analysis of the legislative history of Section 2(11). *See* Defendants' Reply Memorandum, at 31–35 (filed Nov. 29, 1979). Having reviewed this material, the Court concludes that the defendants' position is well taken. The House and Senate Bills (H.R. 4314 and 5480, and S. 875, 73rd Congress, 1st Session), contained different definitions of "underwriter." The House Report noted:

> Paragraph (11) sets forth the important definition of "underwriter." The term is defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also includes as an underwriter the person who purchases an issue outright with the idea of then selling that issue to the public. The definition of underwriter is also broad enough to include two other groups of persons who perform functions, similar in character, in the distribution of a large issue. The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter. The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein.

H.R.Rep. No. 85, 73rd Cong., 1st Sess. 13 (1933).

It is apparent that the warrantholders do not fall within any of the groups included in the House Report's broad definition of underwriter: they played no direct role in the underwriting, and they had no share or interest therein.

The "participation" clause upon which plaintiff relies was added by the Conference Committee. Its report stated:

> The substitute amends the definition of underwriter contained in the House bill so as to make clear that a person merely furnishing an underwriter money to enable him to enter into an underwriting agreement is not an underwriter. Persons, however, who participate in any underwriting transaction or who have a direct or indirect participation on such a transaction are deemed to be underwriters. *The test is one of participation in the underwriting undertaking rather than that of a mere interest in it.*

Conf.Rep. No. 152, 73rd Cong., 1st Sess. 24 (1933) (emphasis added).

This explication precludes any finding that the warrantholders "participated" in the underwriting. The warrantholders had *no* interest, direct or indirect, in the underwriting. In *Quinn & Co. v. Securities & Exch. Comm'n*, 452 F.2d 943, 946 (10th Cir. 1971), the court succinctly stated, "The term underwriter is not limited to its common definition, but rather is a word of art. An underwriter is one who purchases stock from the issuer with an intent to resell to the public." [17] The warrantholders simply do not fit this definition.

Finally, it is clear that classifying the selling warrantholders as underwriters would affront the statutory scheme. The 1933 Act imposes liability on those persons who sell or aid in selling securities to the public. Those who have control over the statements made in a registration statement are made liable for false statements or omissions. The underwriters are subjected to liability because they hold themselves out as professionals who are able to evaluate the financial condition of the issuer. The public relies on their expertise and reasonably expects that they have investigated the offering with which they are involved. Thus the SEC Form S–7, which governed the registration statement here, requires that all underwriters be named in the registration statement and that their compensation be disclosed. The warrantholders were not so named nor, so far as appears from the registration statement, so compensated. The public could not reasonably have relied on their expertise. Plaintiff has alleged no facts which would support a claim that the warrantholders investigated Memorex's financial condition prior to the public offering or that they exercised control over the content of the registration statement. The warrantholders therefore lack the qualifying indicia of underwriters.

This Court has been unable to find any authority supporting plaintiff's theory that persons playing a role comparable to the warrantholders are underwriters for section 11 purposes. [18] Plaintiff relies on two cases, neither of which is on point.

In *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303 (2d Cir. 1977), the court ruled that selling shareholders in a non-underwritten shelf registration were underwriters for the purpose of the prospectus delivery requirements of section 5(b)(1) of the 1933 Act, 15 U.S.C. § 77e(b)(1). In that case, the selling shareholders themselves delivered the stock. The court stated:

> An underwriter who would otherwise be subject to Section 5 requirements plainly does not insulate himself from those requirements by the simple expedient of using a broker to complete his sales transactions.

550 F.2d at 1312.

In addition, the prospectus itself had stated that the selling shareholders " 'may be deemed to be underwriters as that term is defined in the [1933 Act].' " *Id.* at 1307. In short, the prospectus delivery requirements of the 1933 Act were at issue in *Byrnes*, not liability for misleading statements in a registration statement.

*Quinn & Co. v. Securities & Exch. Comm'n*, 452 F.2d 943 (10th Cir. 1971), is equally inapposite. The court there held that one who had acquired unregistered stock from an issuer with a view to resell that stock to the public was an underwriter, and consequently that resale of the stock was not exempt from registration. *Quinn* might best be cited for the proposition that the underwriters, following their purchase of the warrants, sold securities that were not exempt from the registration requirements of the 1933 Act. That proposition has no bearing on the issues in this case.

---

**17.** *See also Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 536 (S.D.N.Y.1977) ("An underwriter buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the insurer and the public.").

**18.** In a document entitled "Declaration of George Donaldson in Opposition to Certain Defendants' Motions to Dismiss," filed November 19, 1979, plaintiff's counsel makes certain representations respecting Judge Williams' oral rulings in *In re Gap Stores Securities Litigation.* Unfortunately, the Court cannot simply defer to counsel's "recollection" in this matter.

No cause of action under section 11 can be stated against the selling warrantholders.

## SECTION 12

■■■ The claim raised under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), is defective as to all defendants. The defects are incurable as to certain defendants.

Section 12(2) provides in part:

Any person who— . . . (2) offers or sells a security . . . shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Because the plaintiff has failed to allege that he purchased his stock from any of the defendants, he has not pleaded an actionable section 12(2) claim. *Competitive Assocs. v. International Health Sciences, Inc.* [1974–75 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 94,966, at 97,334 (S.D.N.Y. 1975).

■■■ Under a literal reading of section 12, only the underwriters bear potential liability: they are the only defendants who sold securities to the plaintiff. Surely the accountants cannot be considered sellers under any interpretation. And the fact that the warrantholders never owned any common stock insulates them from liability. In addition, a review of the prospectus shows that none of the defendant officers or· directors sold any securities in the August 9, 1978, offering. Even Memorex, which sold stock only to the underwriters under a firm commitment underwriting agreement, cannot be held liable under Section 12. *See, e. g., DeMarco v. Edens*, 390 F.2d 836, 841 n.3 (2d Cir. 1968) ("It has been said that, absent a proven agency or a 'control' under Section 15, a purchaser of stock may sustain an action under Section 12 against his immediate seller only.").

Plaintiff urges this Court to adopt an expansive view of the statutory term "seller," and to denominate all of the defendants section 12 sellers. The Court recognizes that a literal reading has not been adopted by all courts.[19] Even under a broader standard, however, a mere allegation of co-conspiracy or of aiding and abetting will not suffice. Congressional intent is paramount in interpreting the reach of the statute. If it appears that Congress intended to place certain limits on liability, as here where it made only sellers liable, then those limits cannot be ignored by resort to theories of conspiracy or aiding and abetting. *In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161, 181 (C.D.Cal.1976).

To the extent that *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366, 378–83 (S.D.N.Y. 1973), and *Hill York Corp. v. American Int'l Franchises*, 448 F.2d 680, 695 (5th Cir. 1971), take a broader view, this Court declines to follow them.[20] The Supreme Court's recent interpretations of the securities laws lead this Court to the ineluctable conclusion that such expansive readings are of questionable validity. This

19. For example, in *Lorber v. Beebe*, 407 F.Supp. 279, 287–88 (S.D.N.Y.1975), the court noted, "As a general rule, therefore, the courts have limited the section to plaintiff's immediate seller [citations omitted]. However, over the years, *exceptions* to this strict privity requirement have developed and, in certain carefully defined instances, liability has been extended to more than the plaintiff's immediate seller. Thus liability has attached to persons acting as the immediate seller's agent, to defendants who are alleged to be controlling persons of the immediate seller, and to those who have actively participated in the sale, either as an aider and abettor or as a co-conspirator [citations omitted]."

20. The Court in *Hill York* rejected a broad participation standard and held that the proper test lies between strict privity and general participation. "[W]e adopt a test which we believe states a rational and workable standard for imposition of liability under [section 12]. Its base lies between the antiquated 'strict privity' concept and the overbroad 'participation' concept which would hold all those liable who participated in the events leading up to the transaction." 448 F.2d at 692.

Court follows the timely opinion in *Collins v. Signetics Corp.*, 605 F.2d 110 (3d Cir. 1979), which takes into account the Supreme Court's recent holdings:

> We have no difficulty in concluding that Congress intended the unambiguous language of § 12(2) to mean exactly what it says: "Any person who—. . . . (2) offers or sells a security . . . shall be liable to the person purchasing from him . . . ." This section is designed as a vehicle for a purchaser to claim against his immediate seller. *Any broader interpretation would not only torture the plain meaning of the statutory language but would also frustrate the statutory scheme because Congress has also provided a specific remedy for a purchaser to utilize against the issuer as distinguished from the seller of a security . . . Ascertainment of congressional intent with respect to the standard of liability created by a particular section of the securities acts must "rest primarily on the language of that section."*

*Id.* at 613 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)) (emphasis added). The Supreme Court's two most recent decisions compel a consonant interpretation. In both *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court made clear that it will not strain for broad readings that stretch beyond congressional intent. In *Transamerica*, the Court stated, "what must ultimately be determined is whether Congress intended to create the private remedy asserted . . . Accordingly, we begin with the language of the statute itself." 100 S.Ct. at 245.

In this case, the language of section 12(2) is not ambiguous. That language allows a buyer to sue his seller. The express remedy —rescission, or damages if the security is no longer owned—strongly suggests that section 12(2) should be read literally to require direct privity. For it would indeed be strange, as the accountants have been quick to note, if a victorious plaintiff could present to the accountants for repurchase securities that they never owned. And the same can be said of every defendant *except* the immediate seller. Because plaintiff can identify nothing in the legislative history that suggests that Congress intended section 12(2) to be read as broadly as he would have it, or that would let a plaintiff undo by rescission an event that never occurred, this Court will adhere to the position that a section 12(2) claim requires "strict privity between the buyer and the immediate seller." *Kramer v. Scientific Control Corp.*, 452 F.Supp. 812, 814 (E.D.Pa. 1978); *Dorfman v. First Boston Corp.*, 336 F.Supp. 1089, 1091–96 (E.D.Pa. 1972).[21]

Plaintiff has not stated a claim against any defendant for primary liability under section 12(2). He can potentially recover only from his direct seller, and only after alleging that he properly tendered his securities to his seller or that he sold the securities to his damage. *Billet v. Storage Tech. Corp.*, 72 F.R.D. 583, 586–87 (S.D.N.Y. 1976).

### SECTION 15

 Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k [section 11] or 77*l* [section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which

---

**21.** In Steinberg, "Section 17(a) of the Securities Act of 1933 After *Naftalin* and *Redington*," 68 Georgetown L.J. 163, 178 (1979), the author recommends that the strict privity requirement in section 12(2) be upheld, despite the author's more expansive reading of section 17. "Section 12(2) requires privity between the defendant and the purchaser."

the liability of the controlled person is alleged to exist.

Plaintiff has alleged that the officers and directors of Memorex as well as the selling warrantholders are liable under this section.[22] Of course plaintiff must establish that Memorex violated Section 11 before any secondary liability can attach.[23] Assuming that he can do so, he must then establish that all other defendants were, as alleged, controlling persons of Memorex.

The Ninth Circuit has adopted as its test for control the definition set forth in 17 C.F.R. § 230.405(f). " '[C]ontrol' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." *Safeway Portland Emp. Fed. Credit Union v. Wagner & Co.*, 501 F.2d 1120, 1124 n. 17 (9th Cir. 1974).

The allegations of the complaint are too vague to establish a "controlling person" relationship between the officers and directors of Memorex and Memorex itself, or between the selling warrantholders and Memorex. There are no specific allegations detailing how the officers, the directors, or the warrantholders possessed the power to direct or cause the direction of the management of Memorex. Plaintiff suggests that any person important enough to be named in the registration statement is presumptively eligible for a "controlling person" designation.[24] What this standard lacks in subtlety it certainly gains in sweep: how the California First Bank, which owned warrants to buy only 867 shares of Memorex common stock, or indeed how Marcelo A. Gumicio, who appears in the registration statement as the vice president of Large Storage Systems Group, can be said to "control" Memorex in any sense of that word is unknown to this Court. Nor are these isolated examples. As Judge Williams recent-

ly noted, "The modern-day proliferation of vice-presidents is proof itself that titles may have more to do with ego than with authority." *In re Gap Stores Securities Litigation*, 457 F.Supp. 1135, 1141 (N.D.Cal. 1978).

If a section 11 violation is proved, plaintiff may recover under section 15 from controlling persons. *See Christoffel v. E. F. Hutton & Co.*, 588 F.2d 665 (9th Cir. 1978). But a mere allegation of control that appears not to have been made in good faith is not sufficient to withstand a motion to dismiss. That is the case here. The section 15 claim must be dismissed.

### SECTION 17

■ Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

No express private right of action for damages exists under section 17(a). This Court must determine whether an implied right should be recognized.

The Supreme Court has reserved this issue. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734 n.6, 95 S.Ct. 1917, 1924 n.6, 44 L.Ed.2d 539 (1975) ("We ex-

---

**22.** At oral argument, plaintiff's counsel suggested that even the accountant defendants may be deemed control persons. *See* Reporter's Transcript at 29 (Dec. 7, 1979).

**23.** As discussed above, no Section 12 liability can be asserted against Memorex, since it sold no stock directly to the public.

**24.** *See* Reporter's Transcript at 31 (Dec. 7, 1979).

press, of course, no opinion on whether § 17(a) in light of the express civil remedies of the 1933 Act gives rise to an implied cause of action."). Among the lower courts, there are decisions that vigorously argue each position.[25] Within this district alone there is conflict. Judge Williams has held that "in the absence of clear guidance from the Ninth Circuit it is the determination of this Court that a private right of action should be implied under § 17." *In re Gap Stores Litigation*, 457 F.Supp. 1135, 1142 (N.D.Cal. 1978). Judge Sweigert has reached a contrary result: "This Court now concludes that implication of a private right of action under Section 17(a) would tend to undermine the carefully framed limitations imposed by Congress on the civil remedies under Sections 11 and 12 of the 1933 Act." *Kaufman v. Burke*, No. C–72–1473–WTS, slip op. at 43 (N.D.Cal., July 20, 1978).[26] This Court concurs with Judge Sweigert that no private cause of action may be stated under section 17.

In recent years, some courts have determined that section 17 is broad enough to embrace a private right of action. *See, e. g., Kirshner v. United States*, 603 F.2d 234 (2d Cir. 1978); *Daniel v. International Brotherhood of Teamsters*, 561 F.2d 1223 (7th Cir. 1977), *rev'd on other grounds*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Newman v. Prior*, 518 F.2d 97 (4th Cir. 1975); *Schaefer v. First Nat'l Bank of Lincolnwood*, 509 F.2d 1287 (7th Cir. 1975).[27] This Court, however, believes that it must look to legislative intent rather than to the reasonableness of implying a private cause of action.

Two recent Supreme Court decisions suggest that the Court is unlikely to infer any new private rights of action under the securities laws.[28]

In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court refused to infer a private right of action under section 17(a) of the Securities Exchange Act of 1934, which requires brokers/dealers to keep certain records and to file reports deemed necessary by the SEC. The legislative history of the Act gave no indication whether Congress intended to create a private right of action. The Court stated, "Implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." 99 S.Ct. at 2486. The Court stressed the fact that other sections of the 1934 Act expressly provided for private damages actions. "Further justification for our decision not to imply the private remedy . . . may be found in the statutory scheme of which § 17(a) is a part . . . § 17(a) is flanked by provisions of the 1934 Act that explicitly grant private causes of action . . . *Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly.*" *Id.* at 2487 (emphasis added).

The Court feared that it would disrupt the statutory framework if it inferred a private damage remedy:

There is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in any reports filed with the Commission . . . *[W]e are extremely reluctant to imply a cause of action in*

**25.** *See Darvin v. Bache Halsey Stuart Shields, Inc.*, 479 F.Supp. 460, 463 n.3 (S.D.N.Y. 1979) (and cases cited therein).

**26.** *See also Reid v. Mann*, 381 F.Supp. 525, 526 (N.D.Ill.1974) ("Viewing the 1933 Act in its entirety, both §§ 11 and 12 contain express provisions for civil remedies, which creates the reasonable inference that the absence of such a remedy in § 17 was not an oversight or the product of inartful draftsmanship.").

**27.** The Eighth Circuit has held that no private right of action exists under section 17. *Shull v.*

*Dain, Kalman & Quail, Inc.*, 561 F.2d 152 (8th Cir. 1977).

**28.** A recent law review article, Steinberg, "Section 17(a) of the Securities Act of 1933 After *Naftalin* and *Redington*," 68 Georgetown L.J. 163 (1979), reaches a contrary conclusion. The Court concludes that the author's expansive reading of *United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1977), is inappropriate here. Different standards apply to analyzing criminal liability under section 17(a) than to deciding whether a civil right of action should be implied.

§ 17(a) that is significantly broader than the remedy that Congress chose to provide.

*Id.* at 2488 (emphasis added).

The Court's conclusion is particularly instructive:

> The invocation of the "remedial purposes" of the 1934 Act is similarly unavailing. Only last Term, we emphasized that generalized references to the "remedial purposes" of the 1934 Act will not justify reading a provision "more broadly than its language and the statutory scheme reasonably permit." *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 116 [98 S.Ct. 1702, 1711, 56 L.Ed.2d 148] (1978); see *Ernst & Ernst v. Hochfelder,* 425 U.S. at 200 [96 S.Ct. 1375, at 1384]. Certainly, the mere fact that § 17(a) was designed to provide protection for brokers' customers does not require the implication of a private damage action in their behalf [citations omitted]. To the extent our analysis in today's decision differs from that of the Court in *Borak,* it suffices to say that in a series of cases since Borak we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today. Cannon v. University of Chicago, 441 U.S. [677] at 698, 99 S.Ct. [1946] at 1958 [60 L.Ed.2d 560]. The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law.

*Id.* at 2490 (emphasis added).

The Court is here indicating that it will expand the reach of a statute only when to do so would comport with the intent of Congress, particularly when it interprets a carefully drawn statute like the 1934 Act.

Plaintiff attempts to distinguish *Touche Ross* as a case that concerned "merely a record keeping statute." Plaintiff's Memorandum at 42. But the Supreme Court did

not analyze the question from so limited a perspective. The Court recognized that it was denying relief to the intended beneficiaries of the section. In both section 17 of the 1934 Act and section 17 of the 1933 Act, investors benefit from compliance and suffer from malfeasance. Despite this, the Court emphasized that it is only to determine whether Congress intended to allow a private cause of action and that it is not free to extend the statute's reach loosely.

In its first opinion this Term, the Court reiterated this reasoning. In *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court refused to infer a private right of action for violations of section 206 of the Investment Advisors Act of 1940, 15 U.S.C. § 80b–1 *et seq.* The Act authorizes the Securities and Exchange Commission to enforce its provisions; it provides no express private damage remedy. The Court stated:

> The question of whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction [citations omitted]. While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, [citation omitted], what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear.

100 S.Ct. at 245 (emphasis added).

Section 206 of the 1940 Act is an antifraud provision whose language is remarkably similar to that of section 17(a) of the 1933 Act.[29] Yet, despite the powerful argument that the Act's intended beneficiary should be entitled to enforce the section, the Court held to the contrary:

> If monetary liability to a private plaintiff is to be found, [the Court] must read it into the Act. *Yet it is an elemental*

---

**29.** Both sections 206 and 17(a) proscribe certain conduct, and sections 17(a)(1) and 17(a)(3) are almost mirrored in sections 206(1) and 206(2). Moreover, the language of section 17(a)(2) is repeated almost verbatim in sections 11 and 12(2), the provisions of the 1933 Act that provide express civil remedies.

*canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it . . . Congress expressly provided both judicial and administrative means for enforcing compliance with § 206 . . . In view of these express provisions for enforcing the duties imposed by § 206, it is highly improbable that "Congress absentmindedly forgot to mention an intended private action."* Cannon v. University of Chicago, 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting).

100 S.Ct. at 247 (emphasis added).

The Court refused to consider the utility of a private remedy, affirming its rejection of that criterion in *Touche Ross.* It concluded:

> [T]he mere fact that the statute was designed to protect the advisers' clients does not require the implication of a private cause of action for damages on their behalf . . . *The dispositive question remains whether Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end.*

100 S.Ct. at 249 (emphasis added).[30]

Plaintiff argues that *Transamerica* differs from this case because the Investment Advisers Act, unlike the 1933 Act, contains no private remedies whatever. The logic of this argument escapes the Court. It would seem more reasonable to infer a private remedy where *none* is provided than to infer an additional one where it appears that Congress has considered the merits of private remedies.

The Court is convinced that Congress did not intend to provide a private right of action under section 17. The legislative history of the 1933 Act contains no language that would suggest that Congress

sought to confer such a right. On the contrary, the House Report states that sections 11 and 12 "create and define the civil liabilities imposed by the act . . . [T]o impose a greater responsibility . . . would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public." H.R. Rep. No. 85, 73rd Cong., 1st Sess. 9–10 (1933). While that expression alone would allow this Court to hold that sections 11 and 12 provide the exclusive private remedies, such a holding is strengthened by the remarks of Judge Friendly, who concluded after a thorough review of the legislative history:

> [T]here is unanimity among the commentators, including some who were in a peculiarly good position to know, that § 17(a)(2) of the 1933 Act—indeed the whole of § 17—was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability, and was never believed to supplement the actions for damages provided by §§ 11 and 12. See Landis, Liability Sections of Securities Act, 18 Am.Acct. 330, 331 (1933); Douglas and Bates, Federal Securities Act of 1933, 43 Yale L.J. 171, 181–82 (1933); 3 Loss, Securities Regulation 1785–86 (1961).

*Securities & Exch. Comm'n v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring), *cert. denied sub nom. Coates v. Securities & Exch. Comm'n,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).[31]

In the light of both the legislative history and the analysis of commentators who participated in the drafting of the statute, the Court concludes that no private right of action can be inferred under section 17(a). The Court is buttressed in this conclusion by the Supreme Court's recent statement

---

**30.** Justice Powell, in a concurrence, interpreted the majority opinion as effectively overruling *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), where the Court had inferred a private right of action in an unrelated area.

**31.** The Court notes that Judge Friendly did find that a private cause of action could be stated under § 17(a). "Once it has been established, however, that an aggrieved buyer has a private action under § 10(b) of the 1934 Act, there seemed little practical point in denying the existence of such an action under § 17." 401 F.2d at 867.

that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* 100 S.Ct. at 247.

The 1933 Act expressly allows the buyer of stock that was issued under a registration statement and prospectus to sue for relief: under section 11, he is entitled to damages from specified persons; under section 12, he is entitled to rescission or to damages from his seller. Under both sections, the measure of damages is clearly defined. Having legislated specifically on the issue, Congress can be presumed to have considered the merit of private remedies for the wrongs defined in the Act. This Court cannot use the language of section 17 to extend liability to others or to circumvent existing procedural limitations. Plaintiff must look solely to the civil remedies that Congress has made available. With respect to section 17, there is no evidence that "Congress absentmindedly forgot to mention an intended private action." *Cannon v. University of Chicago,* 99 S.Ct. at 1981 (Powell, J., dissenting).

Plaintiff can state no claim for relief under section 17 of the Securities Act of 1933.[32]

### SECTION 10(b) AND RULE 10b–5

■ Plaintiff's claims arise out of alleged misrepresentations contained in a registration statement and prospectus that accompanied a public offering of Memorex stock. Plaintiff alleges that the defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder by the Securities and Exchange Commission, by knowingly and willfully withholding relevant information and by distorting financial data in an effort to sell securities to the public at an artificially inflated price.

Section 10(b) makes it

unlawful for any person . . . to use or, employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

It has long been held that a private damage action can be maintained under Section 10(b) and Rule 10b–5. *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa. 1946). The courts are sharply divided, however, on the question whether a plaintiff can pursue a 10b–5 remedy for misstatements that appear in a registration statement governed by the 1933 Act. Nineteen years ago, the Ninth Circuit approved such an action in *Ellis v. Carter,* 291 F.2d 270 (9th Cir. 1961). *Accord, Fischman v. Raytheon Manuf. Co.,* 188 F.2d 783 (2d Cir. 1951). More recently, Judge Ferguson felt bound to apply *Ellis* when he held that the provisions of the 1933 Act were not the exclusive remedies available to aggrieved purchasers and thus did

---

**32.** The Ninth Circuit has ruled recently that the SEC need not show a specific intent to defraud as a prerequisite to an injunction under section 17(a). *Securities & Exch. Comm'n v. Blazon Corp.,* 609 F.2d 960, 965–66 (9th Cir. 1979). This ruling has no impact on our consideration of private remedies under section 17.

not foreclose a section 10(b) action. *Orn v. Eastman Dillon, Union Sec. & Co.*, 364 F.Supp. 352 (C.D.Cal. 1973). *See also Stewart v. Bennett*, 359 F.Supp. 878 (D. Mass. 1973).

Recent Supreme Court decisions have cast doubt on the soundness of *Ellis* and *Orn*. In five successive opinions, the Court has stated beyond cavil that congressional intent is *critical* to a reading of the securities acts. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In each case, the Court has declined to take an expansive reading of the statutory formulation in consideration, and has instead looked closely at the language itself and at the legislative history and intent.

In *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), for example, the plaintiffs brought an action under Rule 10b–5 against the majority shareholders of a corporation in which they held stock and against a firm that had appraised the value of their securities for a "short-form" merger. The Supreme Court held that no cause of action was stated under Rule 10b–5 because that rule does not extend to cases of corporate mismanagement in which a fiduciary mistreats minority shareholders. The Court emphasized that "a private cause of action under the antifraud provisions of the Securities Exchange Act should not be implied where it is 'unnecessary to ensure the fulfillment of Congress' purposes' in adopting the Act." 430 U.S. at 477, 97 S.Ct. at 1303 [citations omitted]. The Court concluded that Congress did not intend to create a remedy for a breach of fiduciary duty when it adopted the 1934 Act, particularly since a plaintiff could seek his remedy under state law, *e. g.*, through appraisal rights. "Absent a clear indication of congressional in-

tent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." 430 U.S. at 479, 97 S.Ct. at 1304.

Similarly, in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Court refused to imply a right of action under Rule 10b–5 for a plaintiff who claimed that he had been misled by a registration statement governed by the 1933 Act. The Court stated:

Sections 11 and 12 of the 1933 Act provide express civil remedies for misrepresentations and omissions in registration statements and prospectuses filed under the Act, as here charged, but restrict recovery to the offering price of shares actually purchased . . . And in Title II of the 1934 Act, 48 Stat. 905–908, the same Act adopting § 10(b), Congress amended § 11 of the 1933 Act to limit still further the express civil remedy it conferred . . . There is thus ample evidence that Congress did not intend to extend a private cause of action for money damages to the nonpurchasing offeree of a stock offering registered under the 1933 Act for loss of the opportunity to purchase . . . . .

*Id.* at 753–54, 95 S.Ct. at 1934.

The Court has attempted to square this recent emphasis on intent with its prior more expansive readings of the securities acts. In *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971), the Court had noted that "[i]t is now established that a private right of action is implied under § 10(b)." Last Term, however, the Court suggested that a reading of the provision on a clean slate might have led to a different result. In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 2490 n.19, 61 L.Ed.2d 82 (1979), the Court stated: "We also have found implicit within § 10(b) of the 1934 Act a private cause of action for damages [citing *Superintendent*]. But we

recently have stated that in *Superintendent* this Court simply explicitly acquiesced in the 25-year-old acceptance by the lower federal courts of an implied action under § 10(b). *Cannon v. University of Chicago,* 441 U.S. at 690–693, n.13, 99 S.Ct. at 1954–55, n.13."

In light of the developing law, this Court is reluctant to conclude that the plaintiff can state a tenable claim under section 10(b) and Rule 10b–5. The alleged misdeeds at issue here fall squarely within the 1933 Act's remedial provisions. In such a case, "it would indeed be anomalous to impute to congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 736, 95 S.Ct. at 1925–26.

This is not a case where a denial of the relief sought would leave a hapless plaintiff without remedy. The securities acts afford an *express* remedy for the misdeeds alleged here, and that remedy is found in Section 11 of the 1933 Act. In the absence of a declared intent by Congress to afford multiple remedies for the same wrong, this Court doubts that the plaintiff should be able to elect an alternative remedy. It can be doubted that Congress intended such a result because it is unclear why it would *sub silentio* take away with one hand what it had one year before given with the other. The 1933 Act sets forth detailed provisions that govern misstatements in a registration statement; for example, it limits the parties that are potentially liable for civil remedies. Section 10(b) contains no parallel limitations. Even the *Ellis* court, in upholding the alternative remedies, was forced to concede that "this construction is saying in effect that the procedural restrictions which Congress carefully provided in the 1933 act with regard to a buyer's civil remedy were completely nullified or ignored by Congress a year later in giving buyers an unrestricted civil remedy." *Ellis v. Carter, supra,* 291 F.2d at 273. In view of the foregoing, this Court is convinced that the Ninth Circuit, if faced with the issue today, would not reaffirm the twenty-year-old ruling in *Ellis.*

This issue has arisen in a very early stage of this lawsuit. Because *Ellis* is technically binding, the Court will not at this time foreclose plaintiff from pursuing his alternative section 10(b)/Rule 10b–5 theory. If he is able to plead the claim with the requisite specificity as to each violation and as to each defendant, he will be allowed to maintain his section 10(b)/10b–5 theory, subject, of course, to reconsideration at a later time in light of developing case law.

### SECTION 18

 Plaintiff concedes that he can state no cause of action under section 18(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78r(a). *See* Plaintiff's Memorandum at 2 n.**.

### SECTION 20

Plaintiff has stated no cause of action under section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t. This section is a "controlling persons" provision that is comparable to section 15 of the 1933 Act. As already stated, the complaint lacks adequate specificity with respect to control. A mere allegation does not suffice.

### STATE LAW CLAIMS

Under a theory of pendent jurisdiction, plaintiff alleges:

> The conduct of the defendants, and each of them, violated the principles of statutory and common law fraud, deceit, negligent misrepresentation, negligence, professional malpractice, breach of fiduciary duty including but not limited to Sections 25401 and 25501 of the California Corporations Code.

Complaint ¶ 13.

These pendent claims are alleged against all defendants indiscriminately. It is not clear how Memorex can be held liable for professional malpractice. Nor is it clear how Ford Motor Credit Company can be held liable for deceit. Similar questions arise with respect to most of the defendants and most of the pendent claims.

 Of course, the exercise of pendent jurisdiction is within a court's discretion.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Any such exercise will be deferred until plaintiff has pleaded a legally sufficient complaint. In his pendent claims as well, plaintiff must plead with greater specificity.[33] From these allegations, no defendant could have any idea which of the pendent claims is directed to him.

### CONCLUSION

Plaintiff's reliance on the landmark case of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), is misplaced.[34] This complaint sounds in fraud and must be pleaded with specificity. The ordinary rules of "notice pleading" do not apply. And if they did, it is still doubtful that this complaint would pass muster.

The most succinct recent expression of pleading requirements in securities suits is Judge Friendly's opinion in *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978). In that case, the district court dismissed a stockholder's purported class action for failure to allege fraud with the particularity required by Rule 9(b). *Denny v. Barber*, 73 F.R.D. 6 (S.D.N.Y. 1977). The Second Circuit affirmed.

The complaint alleged that the defendant bank's 1973 Annual Report was false and misleading, but did not specify the items that were false. The complaint failed to allege which loans, and in what amounts, were "risky." Other allegedly speculative transactions were not identified. The Court concluded:

> [T]he complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones . . . Nowhere does the complaint allege with the required particularity transactions about which defendants in fact had such perceptions or were reckless in not having them when

the 1973 and early 1974 reports were issued . . . *[T]here still must be more than vague allegations that, as shown by subsequent developments, the corporation's true financial picture was not so bright in some respects as its annual reports had painted and that the defendants knew, or were reckless in failing to know, this.*

576 F.2d at 470 (emphasis added).

Plaintiff cannot respond that discovery will clarify these "details." A plaintiff must know about what he is complaining before he files suit. The Supreme Court has condemned discovery in securities actions when it is used as a vehicle for uncovering a claim. The Court has admonished that to the extent that such discovery "permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit." *Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 741, 95 S.Ct. at 1928. *See Denny v. Barber, supra*, 576 F.2d at 470.

In *Denny*, the Second Circuit affirmed the district court's order of dismissal, and held that it was not obligated to give plaintiff still a third try to file a legally sufficient complaint.

The most thorough review of this complaint shows that *no* allegations of fact have been made. There is no discrimination between or among defendants: all are equally culpable; all are aiders and abettors; all are co-conspirators; virtually all are controlling parties of all other defendants. To permit this complaint to stand would be to mock reduce Rule 9(b). That rule is designed to give defendants fair notice of serious charges levelled against

---

**33.** Plaintiff clearly has not met the California pleading requirements for a fraud action. *Crocker-Citizens Nat'l Bank v. Control Metals Corp.*, 566 F.2d 631 (9th Cir. 1977); *Universal*

*By-Products, Inc. v. City of Modesto*, 43 Cal. App.3d 145, 117 Cal.Rptr. 525 (1974).

**34.** *Conley* did not involve Rule 9(b). It was not a fraud case.

them, to screen complaints tending to subject reputations to injury as a result of reckless charges of fraud, to insure that charges are investigated before suit is filed; in short, to avoid strike suits. This Court will not allow this case to proceed on these allegations. Notice pleading does not mean that wild allegations can be raised against anyone for the primary purpose of starting the expensive discovery process in hope of obtaining a substantial settlement.

Plaintiff admittedly has drawn his allegations from a Memorex press release and a *Wall Street Journal* article. He alleges fraud, but offers no detail. As in *Denny v. Barber,* plaintiff here demonstrates his wisdom-by-hindsight. He simply assumes that Memorex must have known certain things at time "x" because it announced them at later time "y." Perhaps Memorex did know, but before plaintiff can proceed, he must place before the Court allegations that meet the requirements of Rule 9(b).

No one questions that plaintiff lost money in Memorex common stock. Few investors have never lost money in the stock market at one time or another. A plaintiff does not state a cause of action because his investment did not pan out. As Justice Powell wrote recently:

> Having "missed the market" on a stock, [plaintiff] is hardly in a unique position. The capital that fuels our enterprise system comes from investors who have frequent opportunities to purchase, or not to purchase, securities being offered publicly. *The market prices of new issues rarely remain static: almost invariably they go up or down, and they often fluctuate widely over a period far less than the two years during which respondent reflected on its lost opportunity.* Most investors have unhappy memories of decisions not to buy stocks which later performed well.

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 757, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, Jr., concurring) (emphasis added).

Memorex stock declined dramatically in October, 1978. The stock market as a whole dropped sharply that month. Predicting stock market behavior is a risky business with high stakes. Plaintiff took that risk and lost. However, he has to say more before he can proceed under the federal securities laws.

The complaint is dismissed in its entirety. Plaintiff is granted 20 days to amend his complaint to plead a cause of action that conforms with this Memorandum of Decision. Failure to do so properly will result in dismissal with prejudice. Discovery is stayed pending further order of this Court.