Harry LEWIS, Derivatively On Behalf of NATIONAL SEMICONDUCTOR CORPORATION, a Delaware corporation, Plaintiff,

v.

Charles E. SPORCK, Peter J. Sprague, Donald E. Weeden, Robert Beshar, Harry H. Wetzel, Neil Goldschmidt, John R. Finch, Pierre R. Lamond, F. Joseph Van Poppelen, Charles C. Cushing, Robert Berryman, Walter R. Conway, Frank Traenkle, E. Floyd Kvamme, David N. Martin, David Turner, William Cox, James Doodey, J. Philip Russell, Patrick Verderico, E. Joseph Willits, and National Semiconductor Corporation, a Delaware corporation, Defendants.

No. C 84–20343 WAI.

United States District Court,
N.D. California.

April 9, 1985.

William S. Lerach, Specthrie & Lerach, San Diego, Cal., Joseph W. Cotchett, Cotchett & Illston, San Mateo, Cal., for plaintiff.

Seymour Kurland, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Richard Haas, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for defendants.

## ORDER

INGRAM, District Judge.

## I. INTRODUCTION

In this shareholder derivative action, plaintiff Lewis is suing on behalf of National Semiconductor Corporation ("NSC") to recover for NSC the damages it has suffered because of the allegedly unlawful activities of certain of its present and former directors, officers, and employees.

The acts on which this suit is based stem from two essentially separate series of

events. The first is the alleged falsification of testing data in connection with the sale of electronic components by NSC to the Department of Defense ("DOD"). The second is the alleged theft of trade secrets from International Business Machines Corporation ("IBM").

The defendants to this action may be divided into four groups. First, defendants Sporck, Sprague, Weeden, Beshar, Wetzel, and Goldschmidt are alleged to have been members of the board of directors of NSC during the relevant time period and to be implicated in both the testing data and trade secret incidents ("director defendants"). In addition, Sporck is alleged to be president and chief executive officer of NSC when these events occurred. Second, defendants Finch, Lamond, Van Poppelen, Cushing, Berryman, Conway, Traenkle, and Kvamme are alleged to be current or former NSC employees who were involved in the testing data falsification incident ("testing data employee defendants"). Third, defendants Russell, Verderico, and Willits are alleged to have been involved in the testing data matter as the chief accounting officers of NSC at that time ("accounting officer defendants"). Fourth, defendants Martin, Turner, Cox, and Doodey are alleged to be current or former NSC employees who participated in the theft of trade secrets from IBM ("trade secret employee defendants").[1]

In addition to the named defendants, Lewis has identified four "co-actors" who are said to have participated in the trade secret theft. These are Barry B. Saffaie, Raymond J. Cadet, Tabasson Ayazi, and Jonathan M. Fram.

Plaintiff's complaint sets forth six causes of action, all of which are grounded on both the trade secrets and testing data matters. Count I alleges violations by all defendants of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 et seq. Count II alleges a violation by the director defendants and the accounting officer defendants of Section 13(b)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78m(b)(2) (Amend.1977). Counts III and IV assert that all defendants have intentionally and negligently breached their fiduciary duties to NSC. Count V alleges that the director defendants have violated Section 2116 of the California Corporations Code. Count VI sets forth a claim that all defendants have violated Sections 17200–17208 of the California Business and Professions Code.

Defendants have moved to dismiss this complaint on a variety of grounds. First, they assert that all claims based on the trade secret theft must be dismissed because Lewis failed to make a demand on NSC's board of directors to bring this lawsuit and there is no showing that such a demand would be futile. Fed.R.Civ.P. 23.1. This motion is GRANTED and all such claims are DISMISSED WITHOUT PREJUDICE to a future assertion in conformance with Rule 23.1.

Second, defendants move to dismiss the RICO claim for failure to plead with the required particularity. This motion is GRANTED. Lewis shall have 30 days from the filing of this order to amend his complaint in accordance with the analysis below.

In addition, defendants move to dismiss the RICO count for failure to state a claim on various grounds. Two of the arguments advanced by defendants are that plaintiff must allege a "racketeering enterprise injury" and that each defendant must have a prior criminal conviction for the alleged predicate acts of racketeering activity. The Supreme Court has recently granted review of two cases which present these issues. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482 (2d Cir.1984), *cert. granted*, — U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985); *Haroco, Inc. v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384 (7th Cir.1984), *cert. granted*, — U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985). Therefore, defendants' motion on these grounds is DENIED WITHOUT PREJUDICE to a renewal of the motion after the Supreme Court issues its rulings. The remainder of defendants' motion as to the RICO claim is DENIED.

---

**1.** National Semiconductor Corporation is named as a nominal defendant.

Third, defendants move to dismiss the claim under Section 13(b)(2) of the Exchange Act on the ground that no private right of action exists under that section. This motion is GRANTED and Count III is DISMISSED WITHOUT LEAVE TO AMEND.

Finally, defendants move to dismiss the state law claims for lack of diversity jurisdiction on the ground that defendant Beshar, like plaintiff, is a citizen of New York. This motion is DENIED WITHOUT PREJUDICE pending the resolution of the viability of plaintiff's federal claims.

## II. FACTS

The alleged facts as to the testing data incident are as follows. NSC was in the business of selling military grade microcircuits to the DOD and to other defense contractors which sell electronic hardware to government. During the three year period from May 1978 to August 1981, NSC submitted compliance reports to the DOD which fraudulently stated that NSC had performed the required testing of the components it was selling. Government specifications require microcircuits earmarked for military use to be "burned in" for 160 continuous hours at a specified temperature, in order to detect defective products. Such tests were not performed. The director defendants, accounting officer defendants, and testing data employee defendants are alleged to have caused the data falsification and the submission of the fraudulent reports.

Based on these falsified reports, NSC was indicted for 17 counts of mail fraud, 18 U.S.C. § 1341, and 23 counts of making false statements to the federal government. 18 U.S.C. § 1001. No individuals were indicted. The company pled guilty to all counts and was fined $1.75 million.

The alleged receipt of trade secrets stolen from IBM arises out of the relationship between National Advanced Systems ("NAS"), a wholly-owned and controlled subsidiary of NSC, and Hitachi, Ltd. ("Hitachi"), a Japanese corporation. NAS markets in the United States IBM "plug-compatible" computers manufactured by Hitachi. The term "plug-compatible," as used in the computer industry, refers to equipment which is designed by reverse engineering of IBM products, which involves examining a piece of equipment to determine how it functions and then reproducing that product. This process allows NAS and Hitachi to produce functional copies of IBM's equipment which will operate with software written for use with IBM computer products with little or no modification to that software. To perform reverse engineering, Hitachi and NAS either have to acquire an IBM product which is already on the market or collect information about imminent product releases by IBM.

The complaint alleges that NAS, with the knowing approval of the director defendants and the trade secrets employee defendants, hired the named co-actors to steal trade secrets from IBM to expedite the process of reverse engineering. These co-actors, some of whom were ex-IBM employees, are alleged to have delivered copies of several confidential IBM documents to NAS in 1981–1982. On June 30, 1982, co-actors Saffaie, Cadet and Ayazi were indicted for multiple counts of knowingly transporting stolen goods, 18 U.S.C. § 2314, and knowingly receiving, concealing, and storing stolen goods. 18 U.S.C. § 2315. As a result, IBM brought a trade secret misappropriation suit against NSC, which was settled for $3 million.

## III. FUTILITY OF DEMAND ON NSC'S BOARD OF DIRECTORS

The complaint alleges that on December 22, 1982 plaintiff made a written demand on NSC's board of directors to institute actions to recover damages suffered as a result of the testing data incident. However, Lewis did not make a similar demand as to the trade secret matter, asserting instead that such a demand would be futile. Defendants argue that all claims based on the alleged trade secret thefts should be dismissed because Lewis has not demonstrated futility. I believe that this argument has merit.

Fed.R.Civ.P. 23.1 sets forth the requirements which a shareholder must satisfy before bringing a derivative action. It states in pertinent part:

[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members and the reasons for his failure to obtain the action or for not making the effort.

Fed.R.Civ.P. 23.1.

Paragraph 16(e) of the complaint sets forth the reasons why Lewis argues that making a demand would be futile:

(i) a majority of the Board of Directors actively participated in the wrongs herein alleged or have ratified them by refusing to take appropriate action to recover from the wrongdoers and have resisted proper efforts to do so;

(ii) many of the acts complained of herein are crimes and others are violations of federal and state statutes, and a waste of National Semiconductor's assets, and thus these acts are incapable of ratification;

(iii) in order to bring this suit, the members of National Semiconductor's Board of Directors would have to sue themselves, which they will not do;

(iv) the directors have defended against the derivative claims of Dorothy Hyman in the ... [lawsuit styled *Hyman v. Sporck*, Civil Action No. 82–5756 (E.D. Pa.1983) which seeks] to recover some of the losses incurred and suffered by the Company from the theft of IBM's trade secrets; and

(v) the directors have taken no action on plaintiff's demand concerning other acts of misconduct.

Complaint, ¶ 16(e).

As to the contention that a majority of the board has actively participated in the alleged wrongs or has ratified them, the specific factual allegations in the complaint establish that the sole involvement of the director defendants in the trade secret incident was that they "caused the Company to hire co-actor Saffaie," Complaint, ¶ 40(a), and that they "knowingly, recklessly or culpably permitted the unlawful acts...." *Id.* at ¶ 44. Hiring Saffaie cannot be said to be a culpable act in and of itself, so the focus is on the permission given by the board to the alleged wrongs.

In *Greenspun v. Del. E. Webb Corp.*, 634 F.2d 1204 (9th Cir.1980), the court stated that:

"where mere approval of corporate action, absent self-interest or other indication of bias, is the sole basis for establishing the director's "wrongdoing" and hence for excusing demand on them, plaintiff's suit should ordinarily be dismissed." *Id.* at 265 [*citing In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973)]. Such bias appears where there is an allegation that the directors have participated in a transaction "completely undirected to a corporate purpose." *Id.* at 265. *Accord, Heit v. Baird*, 567 F.2d 1157, 1160 (1st Cir.1977).

*Id.* at 1210 (footnote omitted).

■ A review of *Kauffman* and *Heit* demonstrates that whether an act was "completely undirected to a corporate purpose" depends on whether or not the act benefited the directors personally at the expense of the corporation. If the act yielded only a personal benefit to the directors, then a presumption of bias is raised. *In re Kauffman Mutual Fund Actions*, 479 F.2d at 265; *Heit v. Baird*, 567 F.2d at 1161–62.

■ In the instant action, there is no allegation that the trade secret thefts personally benefited the members of the board at NSC's expense, nor any other indication of bias. All that is alleged is approval of corporate wrongdoing, which, by itself, is insufficient to justify a finding of futility under Rule 23.1. *Greenspun v. Del. E. Webb Corp.*, 634 F.2d at 1210.

■ The contention that demand is futile because the acts complained of are illegal and, therefore, incapable of ratification

misses the point of the demand requirement. Ratification is not the only option; the board must be given a fair opportunity to decide whether the corporation itself should bring the suit. *Brody v. Chemical Bank,* 517 F.2d 932, 934 (2d Cir.1975).

■ Plaintiff's assertion that demand is futile merely because all the members of the board are named as defendants has been rejected by every circuit court that has considered the issue. *See Lewis v. Graves,* 701 F.2d 245, 249 (2d Cir.1983); *Lewis v. Curtis,* 671 F.2d 779, 785 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Heit v. Baird,* 567 F.2d at 1162, and is rejected by this court.

■ Lewis' fourth justification for relief from the demand requirement is that the board is defending a similar case pending in the Eastern District of Pennsylvania, *Hyman v. Sporck,* Civil Action No. 82–5756. While it is true that actions in other arenas by the board which indicate antagonism to plaintiff's claim may serve as a basis for a finding of futility, *Pioche Mines Consolidated, Inc. v. Dolman,* 333 F.2d 257, 264–65 (9th Cir.), *cert. denied,* 380 U.S. 956, 85 S.Ct. 1081, 13 L.Ed.2d 972 (1965), nothing in the complaint indicates any antagonism on the part of the board to the trade secret claim, only that they have been named as defendants in a similar lawsuit. Without a specific showing of resistance by the board, there is no justification for stripping the directors of their right to conduct the business affairs of the corporation.

■ The final argument for futility is that the Board has taken no action on plaintiff's demand to institute litigation in the fraudulent testing data matter. This argument fails because the trade secrets theft is factually separate from the testing data fraud, and thus the board's failure to act in the one instance is no indication of its intentions in the other. The decision to initiate litigation necessarily requires an analysis of the facts of each situation. *See Joy v. North,* 692 F.2d 880, 892–93 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

## IV.  PLEADING A RICO VIOLATION

As noted above, certain portions of defendants' motion to dismiss plaintiff's RICO claim are denied pending the Supreme Court's decisions in *Sedima* and *Haroco.* The remainder of defendants' assertions as to the RICO claims may be divided into two categories; those concerning the particularity with which a RICO violation must be alleged, some of which are well taken, and other miscellaneous objections to the RICO claim as currently set forth, none of which has merit. Lewis is granted 30 days leave to amend.

### A.  *Pleading RICO With Particularity*

#### 1.  *Legal Framework*

■ Title 18 U.S.C. § 1962, which sets forth the acts which RICO proscribes, contains four subsections, (a)-(d). The instant complaint alleges a RICO violation in general, apparently under all four subsections. The constituent elements of a claim under subsections (a)-(c) are: (1) that the defendant (2) through the commission of predicate criminal acts which constitute a "pattern of racketeering activity"[2] (3) directly or indirectly invests in, or maintains an interest in, or participates in (4) an "enterprise"[3] (5)

---

**2.** "Pattern of racketeering activity" is defined as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." *18 U.S.C. § 1961(5).* "Racketeering activity" is defined as "any act or threat involving murder, kidnaping, gambling, arson, robbery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year," and any act

which is "indictable" under various provisions of title 18 of the United States Code, including section 1341 (mail fraud), section 1343 (wire fraud), sections 2314 and 2315 (interstate transportation of stolen property), and fraud in the sale of securities. *18 U.S.C. § 1961(1).*

**3.** "Enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4).*

the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)-(c). Subsection (d) makes it unlawful for any person to conspire to violate subsections (a)-(c). 18 U.S.C. § 1962(d). To establish a RICO conspiracy claim, plaintiff must allege the existence of either an agreement to commit a substantive violation of RICO, such as conducting the affairs of an enterprise through a pattern of racketeering activity, or an agreement to participate in the predicate acts. *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.1984).

■ The issue here is the particularity with which Lewis must plead the predicate acts of racketeering and the "enterprise." Defendants argue that the predicate acts must be alleged with sufficient specificity to establish probable cause that they were committed by the defendants. *Bache Halsey Stuart Shields, Inc. v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042, 1045–46 (D.Utah 1983). The *Bache Halsey* court based this requirement on general concerns about RICO's breadth plus the fact that "racketeering activity" is defined as acts which are "indictable" under certain federal statutes. *Id.* While I agree that the scope of RICO is cause for concern, the *Bache Halsey* limitation is without foundation. While the elements of proof at trial may include whether or not certain acts are "indictable," notice pleading does not. *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 790 (3rd Cir.1984). Moreover, the *Bache Halsey* standard wrongly incorporates into the civil context the requirements of criminal accusatory pleadings.

■ The better rule of pleading the predicate acts is to apply the Federal Rules in the usual manner. Thus, when the predicate acts sound in fraud, they must be alleged with particularity as required by Rule 9(b). However, if the racketeering acts are not frauds, the general principles of pleading embodied in Rule 8 apply. *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982).

■ As to the pleading of the "enterprise", defendants assert that the complaint must describe with specificity an organized entity that has an ongoing existence that is separate and apart from the racketeering activity which it is alleged to have performed. *United States v. Riccobene,* 709 F.2d 214, 221–24 (3d Cir.), *cert. denied sub nom., Ciancaglini v. United States,* —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). However, the Third Circuit has recently held that a civil plaintiff need not plead all these attributes with specificity. *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d at 790. The Ninth Circuit does not require such a detailed showing of an "enterprise." *United States v. Bagnariol,* 665 F.2d 877, 891 (9th Cir.1981). Absent a special reason to impose a stringent standard on the pleading of a RICO enterprise, the basic liberal pleading rules set forth in Rule 8 must govern.

### 2. *Rule 9(b) and the Pleading of RICO Predicate Acts*

The complaint in the case at bar states that the predicate acts of racketeering consist of:

> Repeated acts of mail fraud violative of 18 U.S.C. § 1341, repeated acts of interstate transportation of stolen property and receipt of stolen property violative of 18 U.S.C. §§ 2314 and 2315, repeated breaches of fiduciary duties owed to National Semiconductor constituting mail and wire fraud violative of 18 U.S.C. §§ 1341 and 1343, and repeated acts of securities fraud.

Complaint, ¶ 50.

■ The stolen property allegations must refer to the claims based on the alleged theft of trade secrets from IBM, which were dismissed above. The remaining predicate acts all sound in fraud, and thus are governed by Rule 9(b).

■ In the Ninth Circuit, Rule 9(b) particularity means that the complaint must set forth "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allega-

tions." *Bosse v. Crowell Collier and Mac-Millan,* 565 F.2d 602, 611 (9th Cir.1977); *see also Walling v. Beverly Enterprises,* 476 F.2d 393, 397 (9th Cir.1973). Under Section 1962(a)-(c), this means that the allegations must identify the time, place, and manner of each fraud, plus the role of each defendant in each scheme. *McFarland v. Memorex Corp.,* 493 F.Supp. 631, 637–639 (N.D.Cal.1980). When a conspiracy is alleged under Section 1962(d), the complaint need not delineate with precision the roles of the various defendants, but it must inform each defendant of what he did to join the conspiracy. *In Re Com. Oil/Tesoro Petroleum Corp. Sec. Lit.,* 467 F.Supp. 227, 252 (W.D.Tex.1979).

As a preliminary matter, the complaint must identify under which subsections of 18 U.S.C. § 1962 Lewis is proceeding. At oral argument, plaintiff indicated that he is asserting that all defendants violated both Sections 1962(c) and 1962(d). That argument does not reflect specific allegations of the complaint.

▇ The only potential predicate acts which are set forth with any particularity whatsoever are the 17 counts of mail fraud contained in the indictment of NSC attached as Exhibit A to the complaint. While the complaint describes various other bad acts, none of them can be construed as mail fraud, wire fraud, or securities fraud because there is no meaningful mention of the interstate mails, the interstate wires, or any securities. Bad acts, alone, do not qualify as predicate acts for RICO purposes; only those activities set forth in 18 U.S.C. § 1961(1) may serve as the basis of a RICO claim.

Although the indictment establishes the time, place, and manner of the alleged frauds, it is silent as to the involvement of the individual defendants because only National Semiconductor was indicted. Hence, one must turn to the factual allegations of the complaint to determine if the individual defendants are given adequate notice of the claims against them.

The only references in the complaint as to the defendants' involvement are several paragraphs which allege that the director defendants, the testing data employee defendants, and the accounting officer defendants "caused" or "permitted" the acts constituting the frauds to occur. Complaint, ¶¶ 24, 25, 26, 31.

Whether these allegations adequately plead mail fraud as a RICO predicate act is a subject for a motion to dismiss for failure to state a claim under Rule 12(b)(6). The issue here is whether these allegations adequately inform the defendants of what they are said to have done.

▇ Such bare allegations that each of the defendants "caused" or "permitted" certain events to occur are insufficient for Rule 9(b) purposes under any of the RICO provisions. Although pleading group conduct may in some cases meet the requirements of Rule 9(b), *In re Equity Funding Corp. of America Securities Litigation,* 416 F.Supp. 161, 181 (C.D.Cal.1976), if Lewis purports to sue directors, accounting officers, *and* mid-level employees of NSC under Section 1962(a)-(c), he must delineate with more precision the involvement of the different groups of defendants. *In re Com. Oil/Tesoro Petroleum Corp. Sec. Lit.,* 467 F.Supp. at 251. Given such diverse groups of defendants, general statements of causation do not give fair notice of the manner in which each group was involved in the fraud. Lewis may base his amended allegations on information and belief, but only if he sets forth a statement of facts upon which the belief is founded. *McFarland v. Memorex Corp.,* 493 F.Supp. at 639.

With respect to the conspiracy allegation under 18 U.S.C. § 1962(d), Lewis must state facts which put each group of defendants on notice as to how they allegedly joined the conspiracy. *In re Com. Oil/Tesoro Petroleum Corp. Sec. Lit.,* 467 F.Supp. at 252. Pleading on information and belief is allowed as described above.

In addition, Lewis may identify predicate acts other than those set forth in the indictment. If they sound in fraud, in addition to complying with the foregoing analysis of

the particularity with which the role of each defendant must be alleged, plaintiff must state the time, place, and manner of such frauds.

## B. *Miscellaneous RICO Issues*

■■■■ Defendants argue that, to state a RICO claim, Lewis must allege that each defendant has a nexus to organized crime, as that term is commonly defined. This court has already declined to impose such a limitation. *Lopez v. Dean Witter Reynolds, Inc.*, 591 F.Supp. 581, 589 n. 6 (N.D. Cal.1984).

■■■■ Defendants also advance the assertion that NSC cannot be both a RICO plaintiff and a RICO enterprise. They argue that a "criminal enterprise" such as NSC, which has pled guilty to various crimes arising out of the testing data incident, should not be able to recover treble damages under RICO. There nothing in the statute that precludes such a claim, but defendants' argument misapprehends the reality of corporate action. A corporation, although a person for certain legal purposes, can act only through its agents. When those agents breach their fiduciary duties to the corporation, the corporation

should have all the recourse to which it is entitled under law.

## V. PRIVATE RIGHT OF ACTION UNDER SECTION 13(b)(2)

Count II of the complaint sets forth a claim under Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2) (Amend. 1977),[4] and two rules promulgated thereunder by the Securities Exchange Commission ("SEC"), Rule 13b2–1[5] and Rule 13b2–2.[6] Defendants have properly moved to dismiss this claim on the ground that there is no implied private right of action under Section 13(b)(2). Count II is dismissed.

## A. *Legal Framework—Implied Private Rights of Action*

In the case of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Court identified four factors which are relevant to the question of whether a private right of action should be implied into a statute:

> [f]irst, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit,

---

**4.** Section 13(b)(2) provides that every corporation having a class of securities registered pursuant to Section 12 of the Exchange Act shall:
(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and
(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
(i) transactions are executed in accordance with management's general or specific authorization;
(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
(iii) access to assets is permitted only in accordance with management's general or specific authorization; and
(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.
15 U.S.C. § 78m(b)(2) (Amend.1977).

**5.** Rule 13b2–1 states that:
[n]o person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.
17 C.F.R. § 240.13b2–1.

**6.** Rule 13b2–2 states that:
[n]o director or officer of an issuer shall, directly or indirectly,
(a) make or cause to be made a materially false or misleading statement, or
(b) omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with (1) any audit or examination of the financial statements of the issuer required to be made pursuant to this subpart or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.
17 C.F.R. § 240.13b2–2.

either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer an action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (emphasis in original, citations omitted).

In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court refocused the inquiry:

[i]t is true that in *Cort v. Ash*, the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicitly in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in Cort—the language and focus of the statute, its legislative history, and its purpose, see 422 US, at 78, 45 L Ed 2d 26, 95 S Ct 2080—are ones traditionally relied upon in determining legislative intent. Here, the statute by its terms grants no private rights to any identifiable class and proscribes no conduct as unlawful. And the parties as well as the Court of Appeals agree that the legislative history of the 1934 Act simply does not speak to the issue of private remedies under § 17(a). At least in such a case as this, the inquiry ends there: The question whether Congress, either expressly or by implication, intended to create a private right of action, has been definitely answered in the negative.

*Id.* at 575–76, 99 S.Ct. at 2488–89. The Court held that, in such a situation, it need not examine whether an implied private remedy is necessary to effectuate the purpose of the section, nor whether the plaintiff's cause of action is one traditionally relegated to state law. *Id.* at 575, 99 S.Ct.

at 2489. *See also California v. Sierra Club*, 451 U.S. 287, 297–298, 101 S.Ct. 1775, 1781–1782, 68 L.Ed.2d 101 (1981).

Finally, in *Merrill Lynch Pierce Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the court reaffirmed that the primary issue is the intent of Congress, *id.* at 377, 102 S.Ct. at 1838, and then went on to provide a framework for the analysis of the legislative history:

the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the preexisting remedy.

*Id.* at 378–79, 102 S.Ct. at 1839–40 (footnote omitted).

This framework, which has come to be known as an analysis of the "contemporary legal context" of the statute in question, defines the question to be answered when one examines the express legislative history of the statute, the second of the *Cort* factors. *Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928, 935 (3rd Cir.1982). The issue is whether one should presume the existence of an implied private remedy when Congress passes a law on the basis of judicial decisions which previously addressed the existence of an implied private remedy in that or other statutes. This analysis is based on the premise that Congress is assumed to be aware of relevant judicial opinions when it enacts legislation. *Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979). If such a presumption

is raised, then congressional silence on the issue is construed as condonation of the existence of a private remedy. If the presumption does not exist, then there must be affirmative evidence of an intent to create a private remedy for one to be found.

### B. *Application of the Cort v. Ash Factors*

#### 1. *Statutory Creation of a Federal Right*

■ The first *Cort* factor is whether the statute expressly creates a federal right in favor of any particular subclass. *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2088. Section 13(b)(2) merely imposes two obligations on regulated corporations; that they meet certain accounting standards and that they establish an internal accounting control mechanism. This section neither creates a federal right on behalf of any specific group nor prohibits any conduct as unlawful.[7] It is clear that, based on the terms of the statute itself,[8] no private remedy may be implied.

#### 2. *Express Legislative History of Section 13(b)(2)*

##### a. *Contemporary Legal Context*

Plaintiff's argument that the contemporary legal context of Section 13(b)(2) supports a presumption that Congress intended to create a private remedy when it en- acted that statute is based largely on *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050 (D.Del.1982). In *Jacobs* the court was faced with the issue of whether an implied private remedy existed under Section 13(d) of the Exchange Act. The court examined the legal context of Section 13(d) when it was last amended and determined that it was proper to presume that Congress intended to create an implied private remedy at the time of this amendment. *Id.* at 1061. The key, from plaintiff's perspective, is that the last time Section 13(d) was amended was in the Foreign Corupt Practices Act (FCPA) the same statute that created Section 13(b)(2). *Id.* at 1059. Lewis contends that this analysis by the *Jacobs* court is equally applicable to Section 13(b)(2). *See also Indiana Nat. Corp. v. Rich,* 712 F.2d 1180, 1184 (7th Cir.1983).

Even accepting the analysis by the *Jacobs* and *Rich* courts of the legal climate of Section 13(d), I believe that the opposite conclusion is required with respect to Section 13(b)(2). The crucial distinction is the extent to which the FCPA affected the two different statutes. The FCPA only slightly modified the statute which was Section 13(d),[9] a statute that several courts had previously found to contain a private remedy. *See Jacobs v. Pabst Brewing Co.,* 549 F.Supp. at 1059 n. 13. On the other hand, Section 13(b)(2), as enacted by the FCPA, was the archetypical "new" statute in *Mer-*

---

7. The FCPA, as passed by the Senate, included statutory language which is identical to Rules 13b2–1 and 13b2–2 as ultimately promulgated by the SEC. S.Rep. No. 114, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad. News 4098, 4106–4107. However, the Conference Committee rejected these provisions, reasoning in its report that to enact a statute which prohibited acts performed "knowingly" would cause unwanted confusion in light of the analysis in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) of the scienter requirement in Section 10(b) of the Exchange Act. H.R.Conf.Rep. No. 831, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 4121, 4123 (hereinafter cited as "Conference Report").

8. Whether the rules promulgated by the SEC prohibit violations of this section as unlawful is irrelevant; it is the statute, not the agency rules, that are the focus of attention. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 577 n. 18, 99 S.Ct. 2479, 2489 n. 18, 61 L.Ed.2d 82 (1979).

9. Section 13(d) requires any person who acquires more than five percent of any equity security registered under the Exchange Act to send a statement containing certain information to the issuer, to each stock exchange where the security is traded, and to the SEC. Prior to the FCPA, the only information that the purchaser had to provide about himself was his background and identity; no information was required about his associates. 15 U.S.C.A. § 78m, Historical Note, 1977 Amendment (West 1981). The FCPA amended Section 13(d) to require disclosure of the residence, citizenship, and nature of beneficial ownership of the purchaser, as well as the background, identity, residence, and citizenship of the purchaser's associates. *Id.*

*rill Lynch* terms; it was unique among the federal securities laws in both wording and purpose.

As a preliminary matter, Section 13(b)(2) was not merely a re-enactment or modification of existing statutory language. Before the FCPA, what is now Section 13(b)(1) was codified as Section 13(b); the FCPA added paragraphs (2) and (3). 15 U.S.C.A. § 78m, Historical Note, 1977 Amendment (West 1981).

More importantly, Section 13(b)(2) represented a new direction in federal regulation of corporate affairs. For the first time, Congress enacted a set of explicit accounting obligations for companies subject to the securities laws. Until 1977 the SEC, under what was then Section 13(b) and is now Section 13(b)(1), had sole authority to promulgate accounting standards to be employed in reports submitted to it. With Section 13(b)(2), Congress interjected itself into this process by establishing accounting standards for regulated companies and requiring them to implement a system of accounting controls to insure that the accounting standards are met. Thus, Section 13(b)(2) "reflects a congressional determination that the scope of the federal securities laws and the SEC's authority should be expanded beyond the traditional ambit of disclosure requirements." *S.E.C. v. World-Wide Coin Investments, Ltd.*, 567 F.Supp. 724, 747 (N.D.Ga.1983).

▮▮▮ In this legislative context, there can be no presumption that Congress intended to create an implied private remedy when it enacted Section 13(b)(2). Therefore, the issue in the case at bar becomes whether there is affirmative evidence in the legislative history that "Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute." *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. at 378, 102 S.Ct. at 1839.

b. *Legislative History of Section 13(b)(2)*

A brief chronology of the legislative development of Section 13(b)(2) is necessary to understand the discussion in the legislative history of implied private remedies. Section 13(b)(2) had its genesis as legislation proposed by the SEC in a report on foreign corporate bribery submitted to the Senate Committee on Banking, Housing and Urban Affairs ("Senate Banking Committee") on May 12, 1976. *Securities and Exchange Commission, Report Submitted to the Senate Committee on Banking, Housing and Urban Affairs on Questionable and Illegal Corporate Payments and Practices*, 94th Cong., 2d Sess. (Comm. Print 1976). On that same day, Senator Proxmire introduced S.3418, a bill which set forth Section 13(b)(2),[10] and the legislation was referred to the Senate Banking Committee. 122 Cong.Rec. 13574. On September 14, 1976, Section 13(b)(2) was reported out of committee as Title I of S.3664, the Foreign Corrupt Practices Act. *Id.* at 30330. On the following day, the Senate passed this bill. *Id.* at 30419.

In the House, Representative Murphy introduced S.3664 as H.R.15481 on September 8, 1976, and the bill was referred to the House Committee on Interstate and Foreign Commerce. *Id.* at 29275. No action was taken on Section 13(b)(2), or any other part of the legislation, because H.R.15481 was not reported out of committee before the end of that congressional session.

In the first session of the 95th Congress, Section 13(b)(2) was introduced in both the Senate and the House. Senator Proxmire introduced an exact replica of S.3664, including Section 13(b)(2), as S.305 on January 18, 1977, and the bill was again referred to the Senate Banking Committee. 123 Cong.Rec. 1458. On May 2, 1977, the committee reported out S.305, *id.* at 13059, and the bill, including Section 13(b)(2),

---

**10.** Section 13(b)(2) as enacted in the FCPA differed marginally from the language proposed in S. 3148. The Conference Committee added the words "in reasonable detail" to Section 13(b)(2)(A) and deleted the word "adequate"

from Section 13(b)(2)(B). Conference Report, *supra* at n. 4, at 4122–4123. For ease of explication, the version of the accounting provisions set forth in S. 3148 and later in S. 305 is referred to in this opinion as Section 13(b)(2).

passed the Senate on May 5, 1977. *Id.* at 13816.

On January 10, 1977, Representatives Murphy and Solarz introduced H.R.1602, which contained language identical to that contained in S.305, including Section 13(b)(2). *Id.* at 445. H.R.1602 was referred to the House Committee on Interstate and Foreign Commerce, *id.*, along with several other bills seeking to discourage illegal overseas corporate payments. On September 28, 1977, the committee reported out H.R.3815, which did not include Section 13(b)(2), but instead adopted other means of combatting foreign corporate bribery. *Id.* at 31404. The House passed H.R.3815 on November 1, 1977. *Id.* at 36303.

Because the House and Senate bills differed in several respects, including the language that was to become Section 13(b)(2), the bills were referred to a Conference Committee. The compromise bill recommended by the Conference Committee, which included Section 13(b)(2), was passed by the Senate on December 6, 1977, *id.* at 38599, and the House on the following day. *Id.* at 38776. The bill was ultimately signed by the President and the FCPA became law.

■ Generally, committee reports constitute the most persuasive source of legislative intent, beyond the words of the statute itself. *Mills v. United States,* 713 F.2d 1249, 1252 (7th Cir.1983). Plaintiff relies on the fact that the House Report did favorably address the question of a private remedy:

> [t]he Committee intends that the courts recognize a private cause of action based on this legislation, as they have in cases involving other provisions of the Securities Exchange Act, on behalf of persons who suffer injury as a result of prohibited corporate bribery. The recognition of such a private cause would enhance the deterrent effect of this legislation and provide a necessary supplement to the enforcement efforts of the Commission and the Department of Justice.

H.R.Rep. No. 640, 95th Cong., 1st Sess. (1977), *reprinted in* 13172–11 House Misc. Reports on Public Bills XI at 10.

This declared intent is irrelevant as to Section 13(b)(2), however, because the bill which the House Report analyzes included no provision comparable to Section 13(b)(2). As stated earlier, although a bill containing Section 13(b)(2) was referred to the House Committee on Interstate and Foreign Commerce, the committee chose not to report out that provision in H.R.3815, the bill to which the above declaration of intent was appended.

The Senate bill did contain Section 13(b)(2), but the Senate Report is absolutely silent on the issue of private actions. *See* S.Rep. No. 114, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad. News 4098 (hereinafter cited as "Senate Report"). The Conference Report is similarly devoid of discussion of this issue. *See* H.R.Conf.Rep. No. 831, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 4121 (hereinafter cited as "Conference Report"). If the members of the House who were conferees of the final bill had desired to make their intent as to private remedies applicable to Section 13(b)(2), they could have convinced the Conference Committee to include such a statement.

■ Although less probative than committee reports, another important source of legislative history is statements by legislators in debates, *United States v. United Auto Workers,* 352 U.S. 567, 585–86, 77 S.Ct. 529, 538–39, 1 L.Ed.2d 563 *rehearing denied,* 353 U.S. 943, 77 S.Ct. 808, 1 L.Ed.2d 763 (1957), especially by sponsors of the legislation. *National Labor Relations Board v. Fruit & Vegetable Packers & Warehousemen,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). Although there are no statements by the sponsors of the FCPA on the issue of implied private remedies, this question was addressed by two members of the Conference Committee, whose opinions are entitled to "some weight." *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. at 1062.

Both of these statements, one by Senator Tower and the other by Representative Devine, occurred after the Conference Committee had reported out its recommended bill, but before final passage of the FCPA by Congress. Congressman Devine stated that he "want[ed] to point out that the Conference Committee report vests enforcement responsibility in the SEC and Justice Department and the conferees did not intend to create a private right of action." 123 Cong.Rec. 38778.

Senator Tower commented that:

[t]he House report states that it is expected that the courts will recognize implied private rights of action under the criminalization sections of the bill. This question was not considered in the Senate or during the conference, and thus cannot be said that any intent is expressed at all on this issue. In view of the existing case law, it is difficult to conceive that the courts would imply a cause of action in any event. Nevertheless, because of the gratuitous statement in the House report, I feel I should state my understanding that neither the Senate nor the conferees expressed any opinion on this issue.

*Id.* at 38602.

The force of Representative Devine's statement is diminished by the fact that, although he supported the Conference Committee's bill, he had joined in a minority report to the House bill that expressed strong opposition to the means of enforcement ultimately adopted by the House. *See* House Report, *supra*, at 19. Nonetheless, this statement was not repudiated by any other House conferee and thus is entitled some deference. *State of Ariz. v. State of Cal.*, 373 U.S. 546, 583 n. 85, 83 S.Ct. 1468, 1489 n. 85, 10 L.Ed.2d 542 (1963), *decree entered*, 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964), *amended*, *Arizona v. California*, 383 U.S. 268, 86 S.Ct. 924, 15 L.Ed.2d 743 (1966). The statement by Senator Tower, which also was not addressed by any of the conferees, is significant because it supports the premise

that the House conferees never even attempted to persuade the Conference Committee to apply the House's declaration regarding private remedies to Section 13(b)(2). At the least, these statements indicate a lack of affirmative evidence of an intent to create a private remedy.

Turning to the final source of express legislative history, testimony at congressional hearings, a review of the record reveals that private remedies were discussed three times; once before the Senate Banking Committee and twice before the House Subcommittee on Consumer Protection and Finance.

In the Senate hearings on S. 305, the bill which contained Section 13(b)(2), the Chairman of the SEC declared in his written statement that this section "would furnish the Commission and perhaps private plaintiffs with potent new tools to employ against" foreign corporate bribery. *Foreign Corrupt Practices and Domestic and Foreign Investment Disclosure: Hearings on S. 305 Before the Senate Committee on Banking, Housing and Urban Affairs*, 95th Cong., 1st Sess. 122 (1977) (hereinafter cited as "Senate Hearings on S. 305").

Although the views of the SEC, as the agency that originally drafted the legislation, are accorded some weight, *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969), this statement is of little significance for several reasons. First, it is unclear whether the SEC was advocating an implied private right of action or merely recognizing that it is possible for courts to recognize one.

Second, there was no oral testimony or discussion during that hearing of implied private remedies under any provision of the bill, let alone Section 13(b)(2). Furthermore, at the only hearing before the Senate Banking Committee where the enforcement mechanism of Section 13(b)(2) was discussed in detail, neither the Chairman nor the members of the SEC, all of whom testified, mentioned implied private rights of action.[11] *See Prohibiting Bribes to For-*

---

**11.** When Section 13(b)(2) was introduced in the

94th Congress, the administration was headed

*eign Officials: Hearings on S. 3133, S. 3379, and S. 3418 Before the Senate Committee on Banking, Housing and Urban Affairs,* 94th Cong., 2d Sess. (1976).

In the House hearings, the Association of the Bar of the City of New York submitted a written statement which declared that "[i]nsofar as the shareholder's suit has been a successful vehicle for protecting the corporation and shareholders in the context of other types of wrongful conduct by management, it should also serve to redress injuries to the corporation resulting from improper foreign payments." *Hearings Concerning the Unlawful Corporate Payments Act of 1977 Before the Subcommittee on Consumer Protection and Finance of the House Committee on Interstate and Foreign Commerce,* 95th Cong., 1st Sess. 90 (1977) (hereinafter cited as "House Hearings"). Whether this statement was intended to apply to the provision in H.R. 1602 which replicated Section 13(b)(2) is unclear because the Association explicitly recommended that this provision not be adopted. *Id.* at 58. Furthermore, such testimony is generally "entitled to little weight," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976), especially in light of the fact that the House ultimately decided not to include in its bill the provision which was similar to Section 13(b)(2).

The Chairman of the SEC also addressed the implied private remedy issue in his tes-

timony at the House Hearings, with a bit more force than he did in the Senate Hearings on S. 305. In both his oral testimony and written statement, the Chairman declared that "this legislation would furnish the Commission and private plaintiffs with potent new tools to employ against" foreign corporate bribery. House Hearings, *supra,* at 198, 219. While this affirmative recommendation of the SEC would be entitled to significant weight if the House had adopted its version of Section 13(b)(2),[12] the House did not do so. Obviously, this statement has no relevance to the intent of the Senate when it passed Section 13(b)(2).

In summation, the express legislative history does not indicate an affirmative intent to create an implied private remedy under Section 13(b)(2). Although the issue was mentioned briefly in testimony by the Chairman of the SEC, this is insufficient to raise an inference of an intent to create a private remedy, in light of the minimal attention devoted to this question at the hearings and the failure of either the Senate Report or the Conference Report to address this issue. The fact that the House Report did express an intent to create implied private remedies is irrelevant because the House bill did not contain a provision similar to Section 13(b)(2).

### c. *Private Remedy Necessary to Effectuate Purposes of Section 13(b)(2)*

■ The purpose of Section 13(b)(2), enacted as part of the FCPA, was to deter

---

by President Ford and the Chairman of the SEC was Roderick Hills. When the 95th Congress convened, President Carter was in office and Harold Williams was Chairman of the SEC. It is impossible to tell from the legislative history the extent to which this change in leadership affected the federal government's position on implied private remedies in Section 13(b)(2).

12. In 1978, subsequent to the passage of the FCPA, the General Counsel of the SEC published an advisory opinion in which he concluded that Congress intended that a private right of action be implied under the FCPA. Opinion of the Office of the General Counsel, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,071 (hereinafter cited as "General Counsel Opinion").

The "construction of a statute by those charged with its execution should be followed

unless there are compelling indications that it is wrong...." *Red Lion Broadcasting Co. v. S.E.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). I believe that the legislative history analysis set forth in this decision demonstrates that the General Counsel's opinion is wrong with respect to Section 13(b)(2). The General Counsel based his conclusion largely upon the testimony at the House hearings by the Association of the Bar of the City of New York and the SEC Chairman plus the statement of intent contained in the House Report. General Counsel Opinion, at 80,804–80,805. If one point is clear from my analysis of the legislative history, it is that statements emanating from the House on the issue of private remedies are irrelevant as to Section 13(b)(2).

bribery of foreign officials by American corporations. Senate Report, *supra*, at 4101–4102. Congress believed that almost all such bribery was covered up in the corporation's books, and that to require proper accounting methods and internal accounting controls would discourage corporations from engaging in illegal payments. *Id.* at 4105. Congress recognized that both investors and the corporation itself would benefit from accurate bookkeeping. *Id.*

Lewis alleges that a proper system of internal accounting controls would have prevented the falsification of testing data certificates submitted to the government and that, as a result of improper bookkeeping methods, the reported profits from the sale of the improperly tested microcircuits were inflated. Clearly, there is no bribery here, either foreign or domestic. Thus, plaintiff's suit does not effectuate the purposes of the FCPA as envisioned by Congress.

It is true that the SEC, in its enforcement actions under this section, has broadened its scope to include all egregious violations of standard accounting principles. *See S.E.C. v. Worldwide Coin Investments, Ltd.,* 567 F.Supp. at 748 n. 41. However, to let private plaintiffs sue under this section whenever a standard accounting principle is violated, which is essentially the position urged by Lewis, would broaden the coverage of this statute far beyond any limit conceived of by Congress. Private plaintiffs, unlike the SEC, are not limited by any notion that they are to act in the public interest.

### d. Availability of State Court Remedy

The acts of which plaintiff complains are traditionally compensable under state law as claims for breach of fiduciary obligations. Indeed, the complaint sets forth causes of action against all defendants for intentional and negligent breaches of fiduciary duty based on the testing data incident.[13] Each of these claims seeks redress for, among other things, the allegedly false statements in NSC's accounting records of profits derived from the sale of the improperly tested microcircuits. Thus, the last of the *Cort* factors also works to plaintiff's disadvantage.

In summary, I conclude that Section 13(b)(2) was not enacted to provide private litigants another cause of action, but simply, and significantly, to establish specific recordkeeping obligations for regulated corporations. These requirements ex-

---

**13.** The intentional breach of fiduciary duty claim alleges that all defendants violated Sections 2254 and 2255 of the California Corporations Code. The negligence claim is not based on any statutes. Section 2254 states:

> Every director, officer, or agent of any corporation, domestic or foreign, is guilty of a felony (a) who knowingly concurs in making, publishing or posting either generally or privately to the shareholders or other persons (1) any written report, exhibit, statement of its affairs or pecuniary condition or notice containing any material statement which is false, or (2) any untrue or willfully or fraudulently exaggerated report, prospectus, account, statement of operations, values, business, profits, expenditures or prospects, or (3) any other paper or document intended to produce or give, or having a tendency to produce or give, the shares of stock in such corporation a greater value or a less apparent or market value than they really possess, or (b) who refuses to make any book entry or post any notice required by law in the manner required by law.

California Corporations Code § 2254

Section 2255 states:

> (a) Every director, officer, or agent of any corporation, domestic or foreign, who knowingly receives or acquires possession of any property of the corporation, otherwise than in payment of a just demand, and, with intent to defraud, omits to make, or to cause or direct to be made, a full and true entry thereof in the books or accounts of the corporation is guilty of a public offense.
>
> (b) Every director, officer, agent or shareholder of any corporation, domestic or foreign, who, with intent to defraud, destroys, alters, mutilates or falsifies any of the books, papers, writings or securities belonging to the corporation or makes or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is guilty of a public offense.
>
> (c) Each public offense specified in this section is punishable by imprisonment in a state prison, or by imprisonment in a county jail for (sic) not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or both such fine and imprisonment.

*Id.* at § 2255.

ist to aid the SEC in its fight against accounting mismanagement, and, if violations occur, the SEC or the Department of Justice may bring enforcement actions. The legislative context in which Section 13(b)(2) was enacted shows that, if a private remedy is to be implied, it must have been affirmatively intended by Congress. The language of the statute itself, the legislative history of the FCPA, the purposes of the provision, and the availability of traditional state court remedies combine to demonstrate that the necessary affirmative intent does not exist.